UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MOSCOW DYNAMO,                          :
                                        :
                    Petitioner,         :
                                        :
        against                         :        Civil Action No. 05-2245-EGS
                                        :
ALEXANDER M. OVECHKIN,                  :
                                        :
                    Respondent.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**RESPONDENT ALEXANDER M. OVECHKIN'S
MOTION TO DISMISS THE PETITION
FOR LACK OF SUBJECT MATTER JURISDICTION**

Respondent Alexander M. Ovechkin respectfully requests that the Court, for the reasons

stated in his accompanying memorandum in support of this motion, dismiss Petitioner Moscow

Dynamo's Petition for Confirmation of Arbitration Award and for Permanent Injunctive Relief

for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure, and grant him such other and further relief as this Court deems just and proper.

Pursuant to LCvR 7(m), the undersigned states that discussions have been had with counsel for

Petitioner and Petitioner opposes this motion.

Dated:          December 9, 2005

                                        Respectfully submitted,


                                        /s/ Peter J.W. Sherwin_____
                                        Peter J.W. Sherwin (admitted *pro hac vice*)
                                        Steven H. Holinstat (*pro hac* pending)
                                        Edward T. Werner (admitted *pro hac vice*)
                                        PROSKAUER ROSE LLP
                                        1585 Broadway
                                        New York, NY  10036-8299
                                        Phone:  212.969.3261

-and-

/s/ Robert M. Bernstein
Robert M. Bernstein (D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 Twentieth Street NW, Suite 800
Washington, DC  20036-2396
Phone: (202) 416-6800

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MOSCOW DYNAMO,                                    :
                                                  :
                           Petitioner,            :
                                                  :
        against                                   :        Civil Action No. 05-2245-EGS
                                                  :
ALEXANDER M. OVECHKIN,                             :
                                                  :
                           Respondent.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# MEMORANDUM OF LAW OF RESPONDENT ALEXANDER M. OVECHKIN IN SUPPORT OF HIS MOTION TO DISMISS THE PETITION FOR LACK OF SUBJECT MATTER JURISDICTION

Peter J.W. Sherwin, Esq. (admitted *pro hac vice*)
Steven H. Holinstat, Esq. (*pro hac* pending)
Edward T. Werner, Esq. (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Phone:  (212) 969-3900

-and-

Robert M. Bernstein, Esq. (D.C. Bar No. 490166)
PROSKAUER ROSE LLP
1233 Twentieth Street NW, Suite 800
Washington, DC  20036-2396
Phone: (202) 416-6800

*Counsel for Respondent*
*Alexander M. Ovechkin*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

SUMMARY OF FACTS AND ALLEGATIONS .................................................................. 4

    A.    THE TWO INDEPENDENTLY DISPOSITIVE FACTS ..................................................... 4

    B.    MR. OVECHKIN AND THE 2004-2005 SEASON ......................................................... 5

    C.    THE PURPORTED MOSCOW DYNAMO CONTRACT FOR THE 2005-2006 SEASON .......... 6

    D.    MR. OVECHKIN'S CONTRACT WITH THE WASHINGTON CAPITALS ........................... 10

    E.    THE PURPORTED ARBITRATION AWARD ................................................................. 11

    F.    THE PETITION FOR ENFORCEMENT OF THE PURPORTED AWARD .............................. 15

OVERVIEW OF THE CONVENTION ON THE RECOGNITION
AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS ........................................... 17

    A.    THE HISTORY OF THE CONVENTION ....................................................................... 17

    B.    ENFORCEMENT PETITIONS UNDER THE CONVENTION:
        THE JURISDICTIONAL PREREQUISITES OF ARTICLES IV ........................................... 18

    C.    THE ABSENCE OF CASES SEEKING ENFORCEMENT UNDER THE CONVENTION
        OF SPORTS ARBITRATIONS AWARDS OR INJUNCTIONS FROM EMPLOYMENT ............. 20

ARGUMENT

THIS COURT HAS NO SUBJECT MATTER JURISDICTION
OVER MOSCOW DYNAMO'S PETITION TO CONFIRM THE
PURPORTED ARBITRATION AWARD AGAINST MR. OVECHKIN ......................... 22

    A.    THE STANDARD FOR DETERMINING WHETHER SUBJECT MATTER JURISDICTION
        EXISTS TO ENFORCE A FOREIGN ARBITRAL AWARD UNDER THE CONVENTION ......... 22

    B.    THERE IS NO SUBJECT MATTER JURISDICTION HERE BECAUSE THE
        PURPORTED 2005-2006 MOSCOW DYNAMO CONTRACT IS UNSIGNED ..................... 29

    C.    THERE IS NO SUBJECT MATTER JURISDICTION HERE BECAUSE
        MOSCOW DYNAMO FAILED TO PROVIDE THE REQUIRED CERTIFIED COPIES ............ 31

CONCLUSION ............................................................................................................. 33

## TABLE OF AUTHORITIES

**Page**

### TREATIES

Convention on the Recognition and Enforcement of Foreign Arbitral Awards
of June 10, 1958 [1970], 21 U.S.T. 2517, 330 U.N.T.S. 38, No. 4739 (1958)..............17

Convention, Art. I ......................................................................................................18

Convention, Art. II......................................................................................................24

Convention, Art. II(1) .................................................................................................25

Convention, Art. II(2) ...........................................................................................19, 25

Convention, Art. II(3) ...........................................................................................19, 25

Convention, Art. III.....................................................................................................18

Convention, Art. IV(1) .........................................................................................19, 23

Convention, Art. V(1) .................................................................................................19

Convention, Art. V(2) .................................................................................................19

### STATUTES

9 U.S.C. §§ 201-08......................................................................................................18

9 U.S.C. § 203.............................................................................................................23

9 U.S.C. § 206.............................................................................................................18

9 U.S.C. § 207.............................................................................................................18

### CASES

*Avraham v. Shigur Express Ltd.*,
1991 WL 177633 (S.D.N.Y. Sept. 4, 1991).........................................................20-21

*Bautista v. Star Cruises*,
396 F.3d 1289 (11th Cir. 2005)...............................................................................27

*Bergesen v. Joseph Muller Corp.*,
710 F.2d 928 (2d Cir. 1983)....................................................................................32

*Bothell v. Hitachi Zosen Corp.*,
   97 F. Supp. 2d 1048 (W.D. Wash. 2000)................................................................ 24, 28

*Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.*,
   109 F. Supp. 2d 1236 (S.D. Cal. 2000)...................................................................... 24

*Chromalloy Aeroservices v. Arab Republic of Egypt*,
   939 F. Supp. 907 (D.D.C. 1996) ................................................................................ 25

*Compagnie d'Enterprises CFE, S.A. v. Republic of Yemen*,
   180 F. Supp. 2d 12 (D.D.C. 2001) ............................................................................. 25

*Consorcio Rive, S.A. de C.V. v. Briggs of Cancun, Inc.*,
   134 F. Supp. 2d 789 (E.D. La. 2001),
   *aff'd*, 82 Fed. Appx. 359 (5th Cir. 2003) .............................................................. 25-26

*Czarina, L.L.C. v. W.F. Poe Syndicate*,
   358 F.3d 1286 (11th Cir. 2004)........................................................................... 23, 26

*Friends of the Earth v. United States Env't Protection Agency*,
   333 F.3d 184 (D.C. Cir. 2003) ................................................................................... 22

*Guang Dong Light Headgear Factory Co., Ltd. v. ACI Int'l, Inc.*,
   2005 WL 1118130 (D. Kan. May 10, 2005)....................................................... 23, 27, 32

*Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*,
   186 F.3d 210 (2d Cir. 1999)............................................................................24, 25, 27, 28

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ............................................................................................... 22, 23

*Konstantinidis v. S.S. Tarsus*,
   248 F. Supp. 280 (S.D.N.Y.),
   *aff'd*, 354 F.2d 240 (2d Cir. 1965) ............................................................................ 17

*Lo v. Aetna Int'l, Inc.*,
   2000 WL 565465 (D. Conn. Mar. 29, 2000)................................................................ 28

*NAR S.p.A. Industria Nastri Adesivi v. I.R. Indus.*,
   5 F. Supp. 2d 203 (S.D.N.Y. 1998) ............................................................................ 32

*Nat'l Educ. Corp. v. Martin*,
   1995 WL 622267 (N.D. Ill. Oct. 20, 1995).................................................................. 21

*Reynolds v. Int'l Amateur Athletic Fed'n*,
   23 F.3d 1110 (6th Cir. 1994)...................................................................................... 20

*Sarhank Group v. Oracle Corp.*,
    404 F.3d 657 (2d Cir. 2005).......................................................................28

*Sen Mar, Inc. v. Tiger Petroleum Corp.*,
    774 F. Supp. 879 (S.D.N.Y. 1991) .....................................................24-25

*Slaney v. Int'l Amateur Athletic Fed'n.*,
    244 F.3d 580 (7th Cir. 2001)...................................................................20

*Sphere Drake Ins. PLC v. Marine Towing, Inc.*,
    16 F.3d 666 (5th Cir. 1994)......................................................................25

*Standard Bent Glass Corp. v. Glassrobots OY*,
    333 F.3d 440 (3d Cir. 2003).....................................................................24

*United States Asphalt Ref. Co. v. Trinidad Lake Petroleum Co.*,
    222 F. 1006 (S.D.N.Y. 1915) ...................................................................17

### JOURNAL AND LAW REVIEW ARTICLES

Ramona Martinez, *Recognition and Enforcement of International
    Arbitral Awards under the United Nations Convention of 1958:
    The "Refusal" Provisions*, 24 INT'L LAW. 487 (Summer 1990)..............17-18

Alan Scott Rau, *The New York Convention in American Courts*,
    7 AM. REV. INT'L ARB. 213 (1996)............................................................18

Respondent Alexander M. Ovechkin respectfully submits this memorandum of law in support of his motion to dismiss Petitioner Moscow Dynamo's Petition for Confirmation of Arbitration Award and for Permanent Injunctive Relief (the "Petition") pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This Court has no subject matter jurisdiction over the Petition to enforce the tendered Russian hockey arbitration award because the purported underlying contract between Moscow Dynamo and Mr. Ovechkin for 2005-2006 is *unsigned*. It is as simple and absolute as that. For that threshold reason, this action should be summarily dismissed, and Mr. Ovechkin should not be put through the time-consuming and costly effort of presenting and establishing his numerous factual and legal affirmative defenses to enforcement of the award.

On its face, this case is about the attempt of Moscow Dynamo, a Russian hockey club, to stop Mr. Ovechkin, one of its former players, from playing with any other club worldwide. In reality, as Moscow Dynamo's President made clear in the press, it is a ploy to obtain a large sum of money to leave Mr. Ovechkin alone. Moscow Dynamo, in order to obtain leverage over Mr. Ovechkin, brought a purported arbitration proceeding against him in Moscow – well after he had moved to the United States – before an internal body of the Russian hockey establishment, whose members were hand picked by the former President of Moscow Dynamo, the current President of Moscow Dynamo, and the presidents of the other Russian clubs. Mr. Ovechkin did not participate in that "arbitration" either personally or through counsel or any other representative. The internal body, not surprisingly, gave Moscow Dynamo exactly what it asked for: an injunction purporting to preclude Mr. Ovechkin from playing hockey this season for anyone in the world other than Moscow Dynamo. Now, Moscow Dynamo comes to this Court,

seeking to have this Court enter that "arbitration award" as its own permanent injunction. (*See* Summary of Facts and Allegations, below.)

There are many reasons why that award should not be recognized in the United States, let alone entered as a judgment of this Court, including the bias and lack of independence of the "arbitration committee." But because Moscow Dynamo has not and cannot satisfy the bedrock threshold requirement of establishing this Court's subject matter jurisdiction to entertain the Petition, this Court need not and should not proceed to those fact-intensive affirmative defenses.

The only basis for this Court's subject matter jurisdiction that Moscow Dynamo has invoked or could invoke is the international Convention on the Recognition and Enforcement of Foreign Arbitral Awards.[1] However, the Convention expressly requires that, in order to invoke the Convention, the underlying arbitration agreement *must be signed*. On that basis alone, courts in the United States regularly dismiss petitions brought under the Convention when the underlying arbitration agreements are unsigned, because the arbitration proceedings and the award are thus outside the scope of the Convention. (Argument Point A, below.)

Here, Moscow Dynamo claimed in the underlying arbitration that Mr. Ovechkin was in breach of a purported 2005-2006 contract with it and sought an injunction precluding him from playing for anyone else during the term of that contract, and so Moscow Dynamo invoked the arbitration clause in that purported contract. As is clear on the face of the copy of that purported contract attached to the Petition, not only does it not even bear Mr. Ovechkin's name, but it is also not signed anywhere, even by Moscow Dynamo. Indeed, that purported contract provides that it is not effective until signed and that it must be signed by the player of his own free will.

---

[1]     Although not part of Mr. Ovechkin's Argument on this motion, an overview section on the Convention is included in this brief in order to provide the Court with background information. (*See* Overview of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, below.)

Thus, without needing to delve into the detailed facts regarding the purported contract, arbitration, and award, this Court should dismiss this action for lack of subject matter jurisdiction under the Convention because the underlying contract is unsigned.  (Argument Point B, below.)

Separately, the Convention also expressly requires that the petitioner provide, at the time of filing, certified copies of both the award and the underlying arbitration agreement.  Here, too, Moscow Dynamo failed to do what the Convention requires, but nonetheless immediately requested that this Court shorten Mr. Ovechkin's time to respond to the facially defective Petition.  The absence of the required certified copies is an independent reason for dismissing the Petition at the preliminary stage.  (Argument Point C, below.)[2]

Therefore, although Moscow Dynamo may be able to try to do something with its "arbitral award" in Russia where it was rendered, Moscow Dynamo clearly cannot bring it to the United States and try to have it enforced under the Convention.  This Court should dismiss this proceeding for lack of subject matter jurisdiction.

---

[2]    Counsel for Moscow Dynamo has just recently informed Mr. Ovechkin's counsel that it is in the process of attempting to obtain certified copies of the award and the purported 2005-2006 Moscow Dynamo contract.  If and when that is done, Mr. Ovechkin will review those certifications and, if appropriate, withdraw the corresponding portion of this motion as moot.  Regardless, however, such certifications would not address, and cannot remedy, the fundamental defect to this Court's subject matter jurisdiction:  that the parties never signed the purported 2005-2006 Moscow Dynamo contract.

## SUMMARY OF FACTS AND ALLEGATIONS

### A.    THE TWO INDEPENDENTLY DISPOSITIVE FACTS

Mr. Ovechkin's motion to dismiss for lack of subject matter jurisdiction is based upon two simple facts, each of which independently provides sufficient basis for dismissal:

1.    Most significantly, and without any possibility of being cured, the purported contract between Moscow Dynamo and Mr. Ovechkin for the 2005-2006 season, which contains the arbitration provision Moscow Dynamo invoked, *is not signed by the parties*.  Indeed, it does not even bear Mr. Ovechkin's name anywhere on it.  (Pet. Ex. B, Supp. 1, doc. 2 (the "2005-2006 Moscow Dynamo Contract").)[3]

2.    Moscow Dynamo did not file with its Petition the original or a certified copy of: (a) the purported arbitration award that it seeks to enforce through this Court; and (b) the purported 2005-2006 Moscow Dynamo Contract that contains the arbitration provision it invoked.  Rather, Moscow Dynamo merely attached unauthenticated, uncertified copies of those documents.  (*See* Pet. at Ex. A and Ex. B, Supp. 1, doc. 2.)[4]

With those two facts – readily apparent on the face of the Petition and the purported 2005-2006 Moscow Dynamo Contract – nothing further is needed.

\*   \*   \*   \*   \*

For the convenience of the Court and to provide context to this proceeding, the following review of allegations and facts is provided.  Because in support of this motion Mr. Ovechkin

---

[3]    For the Court's convenience, attached as Exhibit 1 to the Declaration of Peter J.W. Sherwin, Esq., dated December 9, 2005 (the "Sherwin Decl."), is a copy of what Moscow Dynamo attached to the Petition as the purported 2005-2006 Moscow Dynamo Contract, along with Moscow Dynamo's translation.

[4]    The Petition states that the Statement of Claim is attached as Exhibit A and the Award is attached Exhibit B, but it is actually the reverse.  To reduce confusion, this memorandum cites to where those documents are actually attached to the Petition:  the Award at Exhibit A, and the Statement of Claim at Exhibit B.

does not rely upon anything beyond what Moscow Dynamo alleges in and attaches to its Petition, any additional contextual information included below is, at this time, provided based upon proffer and news articles.

**B.**     **MR. OVECHKIN AND THE 2004-2005 SEASON**

Mr. Ovechkin is a fast-rising star in professional ice hockey.  He played in the World Junior Championships in 2003, 2004, and 2005, the World Championships in 2004 and 2005, and the World Cup of Hockey in 2004.  At the 2005 World Junior Championships, held in the United States, Mr. Ovechkin was named the top forward and also earned a silver medal. Although he only recently turned 20 years old, Mr. Ovechkin plays left wing for the Washington Capitals, the National Hockey League team that plays its home games at the MCI Center in downtown Washington D.C.  (Sherwin Decl. Ex. 2; Pet. ¶ 7.)

Mr. Ovechkin's relationship with his team, the Washington Capitals, started dramatically a year and a half ago.  Mr. Ovechkin was in Raleigh, North Carolina for the 2004 National Hockey League entry draft on June 26, 2004, and the Washington Capitals made him the #1 overall pick.  (Pet. ¶ 10.)  The Washington Capitals have been a Washington institution for over 30 years, and Mr. Ovechkin was the team's first #1 overall draft pick since 1976.  Unfortunately, the 2004-2005 National Hockey League season was cancelled because the league and the players' union could not readily agree upon the terms of a new collective bargaining agreement. (*See* Sherwin Decl. Ex. 3.)

Thus, while he waited for the lockout to end so that he could come to the United States and play with the Washington Capitals, Mr. Ovechkin played the 2004-2005 season for Moscow Dynamo, the club in the Russian Professional Hockey League where he had previously played. (*See* Pet. ¶ 11.)  Mr. Ovechkin's contract with Moscow Dynamo for the 2004-2005 season

expired by its express terms on April 30, 2005, over seven months ago.  (*Id.*; Pet. Ex. B, Supp. 1, doc. 1 ("2004-2005 Moscow Dynamo Contract") ¶ 2.1.)

C.    <u>THE PURPORTED MOSCOW DYNAMO CONTRACT FOR THE 2005-2006 SEASON</u>

Moscow Dynamo offered Mr. Ovechkin a new contract for the 2005-2006 season (Pet. ¶ 11), but Mr. Ovechkin refused the offer because he did not want to play for Moscow Dynamo any longer.  Moscow Dynamo had breached its 2004-2005 contract with Mr. Ovechkin by, among other things, failing to provide suitable housing and, thereafter, by failing to pay suitable compensation in lieu thereof.  Additionally, Moscow Dynamo had essentially disbanded the team that played together for the 2004-2005 season.

Thus, Mr. Ovechkin anticipated that for the 2005-2006 season he would play for the Washington Capitals if the labor negotiations were successful but, if they were not, wanted to play for the Avangard Omsk club in the Russian Professional Hockey League.  So, on June 30, 2005, Mr. Ovechkin entered into a preliminary agreement with Avangard Omsk for the 2005-2006 season that would go into effect on July 21, 2005 unless Mr. Ovechkin gave notice by July 20, 2005 that he was going to accept an offer from a National Hockey League team.  In that event, the contract would terminate immediately and be null and void.  (Avangard Omsk Contract Rider ¶ 2 (Pet. Ex. B, Supp. 5); *see* Pet. ¶ 12.)[5]  This "null and void" provision was absolutely critical to Mr. Ovechkin – there would have been no agreement without it – and so it had great financial significance because it would allow him to plan for the next season but still be able to play for the Washington Capitals if he had sufficient comfort that the lockout would

---

[5]    The Avangard Omsk Contract Rider was imprecisely translated as attached to Moscow Dynamo's Petition. That provision reads as drafted in its original English:  "The Club agrees that the Player shall have the right to accept an Offer to Contract from a National Hockey League Club at any time prior to midnight July 20th Eastern Standard Time, 2005.  If the Player elects to accept the said Offer to Contract, then the Club agrees that the Player shall have the right to terminate this contract immediately and both the Club and the Player agree that this contract shall be null and void."

end in time.  That contract also contains the standard provision that it can be terminated by

mutual consent of the parties.  (*See* Pet. Ex. B, Supp. 4; *see, e.g.*, 2004-2005 Moscow Dynamo

Contract ¶ 5 (Pet. Ex. B, Supp. 1, doc. 1).)

On July 1, 2005, Moscow Dynamo purported to exercise its claimed right to match the

Avangard Omsk Contract even though it was in breach of its 2004-2005 contract with

Mr. Ovechkin and even though it did not match the very significant "null and void" provision of

the Avangard Omsk Contract.  Moscow Dynamo rationalized its failure to match the "null and

void" provision by characterizing it as a non-financial term and by relying upon a ruling it claims

to have obtained from the Russian Professional Hockey League.  (Pet. ¶ 15.)  On July 4, 2005,

Avangard Omsk commenced a proceeding before an internal body of the Russian Professional

Hockey League to declare that Moscow Dynamo had no right to claim a contract with

Mr. Ovechkin for the 2005-2006 season.

On July 20, 2005, Mr. Ovechkin rendered all of that moot:  the Avangard Omsk Contract,

the purported 2005-2006 Moscow Dynamo Contract founded upon the Avangard Omsk

Contract, and Avangard Omsk's proceeding against Moscow Dynamo.  On July 14, 2005, it was

widely reported that the National Hockey League and the Players Association had reached a deal

on a new collective bargaining agreement.  (Sherwin Decl. Ex. 4.)  Based on that, Mr. Ovechkin

decided that he was going to contract with the Washington Capitals, move to the Washington

area, and play with them starting with the 2005-2006 season.  Thus, on July 20, 2005, he

delivered to Konstantin Potapov, the President of Avangard Omsk, a written notice that he "has

agreed to accept an Offer to Contract from the Washington Capitals Hockey Club of the National

Hockey League," that he therefore "exercises the right to terminate the Contract immediately,"

and that, "as per the terms of the Contract, the Contract is now null and void."  (Sherwin Decl.

Ex. 5; *see* Pet. Ex. C, doc. 2.)  Mr. Potapov accepted the notice, acknowledged that the Avangard

Omsk Contract was null and void, and wished Mr. Ovechkin success with the Washington

Capitals.  (*See* Sherwin Decl. Ex. 6.)  The next day, the spokesman for Avangard Omsk

announced that "[Mr. Ovechkin] is the best young player in the world, and he decided to give the

NHL a shot.  We don't have any problems with the decision."  (Sherwin Decl. Ex. 7.)

On July 22, 2005, Mr. Ovechkin's decision was covered in the Russian sports press.  As

part of that coverage, even Moscow Dynamo acknowledged that it did not have a contract with

Mr. Ovechkin and expressed no desire to have him play for Moscow Dynamo.  Rather, it

explained that its concern was how it was going to be able to demand compensation from the

Washington Capitals in the absence of Russia being a signatory to the International Ice Hockey

Federation agreement with the National Hockey League regarding transfer payments.  Anatoly

Kharchuk, President of Moscow Dynamo, responded as follows in an interview:

Q:      You have said more than once that you are expecting to receive solid
        compensation from Washington.  As you know, people have been talking
        about a sum on the order of two million dollars.

A:      Yes, but now in light of how Ovechkin treated us, there is, alas, no more
        talk of such money.  *If we had a signed contract with him* – then we could
        really have entered into such negotiations with the Capitals.

                                        *  *  *

Q:      Are you very disappointed?

A:      Of course, we are losing exactly half of the transfer value.  Which we
        might not have lost *if Ovechkin had* conducted himself normally and
        *signed a contract with us*.  Now we are given conditions that we have to
        agree with the new version [of the International Ice Hockey Federation
        agreement]; otherwise he will simply go for free.  *Our current rights to
        Ovechkin have terminated by the fact that Dynamo was his last employer.*

Q:      *Incidentally, why not sign a token contract with Ovechkin now,
        considering that his agreement with Avangard never came into force –
        simply so that Dynamo could receive compensation?*

8

A:      *We do not intend to humiliate ourselves before Ovechkin by proposing such a possibility to him.*  If he himself expresses such a desire – by all means.

(Sherwin Decl. Ex. 8 (emphasis added).)

In the same article, Mr. Potapov of Avangard Omsk confirmed the situation:  "As you know, Ovechkin categorically did not want to sign a new contract with Dynamo, and it was because he was prepared to leave Russia."  (*Id.*)  Mr. Potapov also made it clear that, apparently from the beginning, Moscow Dynamo's desire to contract with Mr. Ovechkin for the 2005-2006 season was solely in order to gain leverage to get payment from his new team, and not in order to have him actually play for Moscow Dynamo:  "You see, at first we came to a compromise with the Dynamo club, according to which Ovechkin would start to play in Omsk.  It only remained to get our agreement on paper, but, unfortunately, the Dynamo managers began to overtly stall for time, to delay signing the compromise version that suited all parties."  (*Id.*)

Although this situation was just about money for Moscow Dynamo, Mr. Ovechkin made clear in the same article that his motivations were quite different:  "It is no secret that in Russia they offered me more money.  But I am going to the NHL anyway, not for the money, but in order to continue growing and to improve my skills.  I am going in order to prove that I am already worthy of a place in the best league in the world."  (*Id.*)

Because Mr. Ovechkin had exercised the "null and void" provision, Avangard Omsk withdrew its statement of claim in the proceeding it had commenced before the internal body of the Russian Professional Hockey League to declare that Moscow Dynamo had no claim to Mr. Ovechkin's services for the 2005-2006 season.  (*See* Pet. Ex. B, Supp. 8.)  On August 8, 2005, apparently at the unilateral request of Moscow Dynamo, that internal body – the so-called "Arbitration Committee" – nonetheless went forward with the proceedings with only Moscow Dynamo present; Avangard Omsk had withdrawn its request and so did not participate, and

9

Mr. Ovechkin was never a party to that proceeding and so did not participate. Not surprisingly, the internal body ruled that Moscow Dynamo "is entitled to compensation for player A. M. Ovechkin, the product of the youth program of Dynamo." (*Id.*)

**D.    M**R**. O**VECHKIN'S **C**ONTRACT WITH THE **W**ASHINGTON **C**APITALS

Mr. Ovechkin finalized the terms of his agreement with the Washington Capitals on August 3, 2005 and then, while still in Russia, signed his contract with the Washington Capitals on August 11, 2005. A new era for the Washington Capitals had begun. Soon thereafter, Moscow Dynamo was again in the press regarding its attempts to get compensation for Mr. Ovechkin's move to the Washington Capitals, although it still was not even asserting the existence of a contract with Mr. Ovechkin for the 2005-2006 season, let alone any breach thereof. As reported on August 19, 2005, Mr. Kharchuk, president of Moscow Dynamo, stated: "Naturally, we are very disappointed that in this situation we might end up with no compensation whatsoever for Ovechkin. Russia is the only country that hasn't signed a contract with the NHL, and there is no telling what dangers this presents for us." (Sherwin Decl. Ex. 9; *see also* Sherwin Decl. Ex. 10 (quoting Mr. Kharchuk in July 2004 as stating: "Under the old deal, we would have got only $200,000 for such a great player like Ovechkin. Such a sum is clearly inadequate. We think he is worth at least $2 million.").)

Mr. Ovechkin then went forward and arrived in Washington D.C. on August 31, 2005. That very day, Mr. Ovechkin with pride signed his contract again, this time in person with the General Manager of the Washington Capitals. (Sherwin Decl. Ex. 11; Pet. ¶ 16; Pet. Ex. C.) He then found a house to purchase located close to downtown Washington D.C. so that he and his brother could have a home in the United States where their parents could visit, started training camp with the Washington Capitals on September 12, 2005, and played several exhibition games with them. (*See* Sherwin Decl. Exs. 12 and 13.)

10

Training for the Russian Professional Hockey League 2005-2006 season started on July 15, 2005 and the regular season started on September 7, 2005. Thereafter, on September 15, 2005, two months after it had begun preparing for the season, Moscow Dynamo first asserted that it had a contract with Mr. Ovechkin, doing so in a letter from Mr. Kharchuk to the Commissioner of the National Hockey League. (Sherwin Decl. Ex. 14.) That was clearly something Mr. Kharchuk had not asserted in prior interviews or writings.

October 5, 2005 was the date of the Washington Capitals opening game of the NHL 2005-2006 season. With his parents and brother watching from the stands, Mr. Ovechkin made headlines by scoring two goals and helping the Washington Capitals defeat the Columbus Blue Jackets at the MCI Center in downtown Washington. (Sherwin Decl. Exs. 15 and 16.)

## E. THE PURPORTED ARBITRATION AWARD

On October 6, 2005, Moscow Dynamo commenced the underlying arbitration with the submission of a Statement of Claim. (Pet. ¶ 19.) That was well over a year after Mr. Ovechkin was drafted by the Washington Capitals, more than two months after Mr. Ovechkin announced that he would be playing for the Washington Capitals starting with the 2005-2006 season, more than two months after Moscow Dynamo admitted in the press that it had no signed contract with him, over a month after Mr. Ovechkin left Russia and moved to the United States to start training and playing with the Washington Capitals, and a month after the Russian 2005-2006 season started. Notably, Moscow Dynamo did not seek at that time, or at any time since then, from this Court or any other court, a preliminary injunction in aid of that arbitration.

To bring that proceeding, Moscow Dynamo invoked the arbitration provision in its purported 2005-2006 contract with Mr. Ovechkin. (Statement of Claim at 1 (Pet. Ex. B); Pet. ¶¶ 1, 18.) Moscow Dynamo alleged that Mr. Ovechkin was in breach of that purported 2005-2006 Moscow Dynamo Contract and sought: (1) a declaration that that contract is in effect; (2) a

finding that Mr. Ovechkin is in breach of that contract; (3) an injunction precluding Mr. Ovechkin from playing during the 2005-2006 season for any team other than Moscow Dynamo; and (4) a waiver of the standard delay before such injunction would go into effect. (Statement of Claim at 2-3 (Pet. Ex. B); Pet. ¶ 19.)

The purported 2005-2006 Moscow Dynamo contract does not bear Mr. Ovechkin's name as a party to the agreement, is not signed on any of the signature lines that appear at the bottom of each page, and does not even include a set of signature blocks on the last page, let alone one with signatures. (2005-2006 Moscow Dynamo Contract (Sherwin Decl. Ex. 1); *see also* Pet. ¶ 18 n.2 (acknowledging that the purported contract is unsigned).) Further, the introduction to the document provides: "Before signing this Contract, you should carefully examine it to be sure that all terms and conditions agreed upon have been included herein, and you understand its content and interpretation." (2005-2006 Moscow Dynamo Contract (Sherwin Decl. Ex. 1).) Also, although the purported 2005-2006 Moscow Dynamo Contract is missing its last page, at least two key provisions would appear there. Paragraph 8.3 would provide, in pertinent part, that "the Contract comes into effect from the moment it is signed." (*See, e.g.*, 2004-2005 Moscow Dynamo Contract ¶ 8.3 (Pet. Ex. B, Supp. 1, doc. 1).) And the final paragraph would provide: "Having read the present Contract, the Club and the Player agree that all the terms and obligations of the Contract as well as their interpretation are clear to them. All parties to this Contract had an opportunity to discuss all terms and obligations with their attorneys, physicians, agents and other representatives *and the Contract is signed of their own free will*." (*See, e.g.*, *id.* at 7 (emphasis added).)

Moscow Dynamo brought its proceeding before the "Arbitration Committee of the Russian Ice Hockey Federation and the Professional Hockey League." That standing internal

body is comprised of six individuals: five members appointed, not by the parties to the arbitration, but rather by the Board of Presidents of the Russian Professional Hockey League (of which Moscow Dynamo's President, Mr. Kharchuk, is a member) and the Executive Committee of the Russian Ice Hockey Federation; and a Chairperson appointed by the President of the Russian Ice Hockey Federation, Alexander Steblin, who was formerly President of Moscow Dynamo. (Pet. Ex. E, Ex. B, Arts. 5 and 6.) At the time of the proceedings against Mr. Ovechkin, the "Arbitration Committee" was comprised of the following individuals:

- Vsevolod V. Kukushkin, Chairperson. He is the personal interpreter to Mr. Steblin, the President of the Russian Ice Hockey Federation, who appointed him as Chairperson of the "Arbitration Committee." Mr. Steblin also appointed him on behalf of the Russian Ice Hockey Federation to the Evaluation Committee and the Hall of Fame Committee of the International Ice Hockey Federation.

- Anatoly M. Barinov. He is the Technical Director of the Russian Ice Hockey Federation and Chairman of the Referee Committee of the Russian Ice Hockey Federation.

- Sergei G. Yakovlev. He is the Legal Director of the Russian Professional Hockey League.

- Valentin I. Kozin. He is the Secretary General of the Russian Ice Hockey Federation.

- Natalia A. Ovchinnikova. She is an attorney and organized the Election Conference of the Russian Ice Hockey Federation in April 2005, at which Mr. Steblin was elected President of the Russian Ice Hockey Federation.

- M. A. Lukina. She is a secretary at the Russian Ice Hockey Federation.

This is the same "Arbitration Committee" that heard the statement of claim by Avangard Omsk against Moscow Dynamo, even though Avangard Omsk withdrew it as moot, and that ruled for Moscow Dynamo. (Pet. Ex. B, Supp. 8.)

According to the Petition, the hearing in Moscow Dynamo's proceeding took place on October 20, 2005. (Pet. ¶ 21.) Mr. Ovechkin was then in the United States playing for the Washington Capitals, the NHL season (including the pre-season) having started a month earlier.

13

Mr. Ovechkin did not participate in the Moscow Dynamo proceeding, personally, through counsel, or through any other representative. (*Id.*)  The hearing was conducted by only five of the six members of the "Arbitration Committee," without Mr. Yakovlev, the Legal Director of the Russian Professional Hockey League. (*See* Award at 5 (Pet. Ex. A).)

Again according to the Petition, the very next day, October 21, 2005, the "Arbitration Committee" issued its award. (Pet. ¶ 22.)  The award parrots back the allegations in the Statement of Claim and then grants Moscow Dynamo everything it demanded:  (1) a declaration that the purported 2005-2006 Moscow Dynamo Contract is in effect; (2) a finding that Mr. Ovechkin is in breach of that contract; (3) an injunction purporting to preclude Mr. Ovechkin from playing during the 2005-2006 season for any team other than Moscow Dynamo; and (4) a waiver of the standard delay before such injunction would go into effect. (Award at 5 (Pet. Ex. A); *compare with* Statement of Claim at 2-3 (Pet. Ex. B); *see* Pet. ¶ 23.)

The "Arbitration Committee" issued its Award against Mr. Ovechkin at the request of Moscow Dynamo despite the serious concerns of the Russian Superleague Council and Mr. Kharchuk's public acknowledgment that that body was partisan and lacked independence. As reported in the Russian sports press on September 14, 2005:

> An emergency session of the Superleague Council was held yesterday in the Olympic Committee building.  The managers of 18 clubs attended.  One of the main topics of discussion was the current rules and their obvious defects, which led to a half-dozen prominent scandals involving player transfers during the last off-season.  After the meeting, Sports Express asked representatives of the clubs embroiled in the largest number of disputes to comment.

(Sherwin Decl. Ex. 17.)  When the reporter asked Moscow Dynamo's President, Anatoly Kharchuk, "What happened behind closed doors?," Mr. Kharchuk responded:

> . . . .  We also adopted a decision regarding the arbitration committee:  We propose to increase the number of members and *appoint to the committee only people who are absolutely non-partisan and independent, people who don't work for the Professional Hockey League [PHL] or the federation*.  They should all

have a legal education, and they should include experts who have hockey-playing experience.

(*Id.* (emphasis added).)  Regarding the then-current "Arbitration Committee," Kirill Fastovsky, the manager of one of the other clubs, stated:

> Our club shares the PHL's concerns regarding the activity of the arbitration committee, said Kirill Fastovskiy, general director of TsSKA [Central Army Sports Club].  *Everyone remembers well how many scandals and complaints went along with the decisions made by the committee. . . .*  In general, the TsSKA hockey club believes that the arbitration committee has the exclusive right to resolve all disputes.  *But its members must be independent people who make thoughtful and legally proper decisions.  However, the current membership of the committee is completely dependent, because its members work for the PHL and the RIHF, and they often have an interest in a certain outcome.*

(*Id.* at 2 (emphasis added).)

With that pressure, on October 28, 2005, only eight days after the Ovechkin award, the Executive Committee of the Russian Ice Hockey Federation formally decided to replace the members of the "Arbitration Committee," and replacement members were confirmed on November 14, 2005 and started their term on December 1, 2005.

## F.    THE PETITION FOR ENFORCEMENT OF THE PURPORTED AWARD

In the month following the Award, Mr. Ovechkin continued to play with the Washington Capitals, and Moscow Dynamo still did nothing in the United States courts or elsewhere.  By November 18, 2005, Mr. Ovechkin was 11 weeks into the season (including the pre-season), had scored a notable 15 goals and 6 assists in 19 regular-season games, and was being widely heralded as a prime candidate for rookie-of-the-year honors.  Indeed, on November 15, 2005, Mr. Ovechkin had what was his biggest game of the year as of then.  It was a home game at the MCI Center against the defending Stanley Cup Champion Tampa Bay Lightning, and he scored the tying goal late in the game and then won the game on a shootout goal.  The next day,

Mr. Ovechkin was in the worldwide sports press for his performance on the ice.  (Sherwin Decl. Ex. 18.)

On November 18, 2005, two days after that remarkable press coverage and one month after the Award was issued, Moscow Dynamo finally commenced this action.  That day, it filed a petition requesting that this Court recognize the Award and enter it as if it were a permanent injunction issuing from this Court.  Again, however, Moscow Dynamo did not request any interim relief from this Court, seeking no temporary restraining order or preliminary injunction. Moscow Dynamo served Mr. Ovechkin personally on Saturday, November 19, 2005 in Montreal, Canada, while he was there for an away game with the Washington Capitals in professional hockey's most media intensive venue.

Moscow Dynamo attached to its Petition a copy of the purported Award, but provided no certification from a person with actual knowledge that that is the actual Award issued by the "Arbitration Committee."  Similarly, Moscow Dynamo attached to its Petition a copy of its Statement of Claim, which in turn attached a copy of the purported 2005-2006 contract between Moscow Dynamo and Mr. Ovechkin, but again provided no certification from a person with actual knowledge that that is actually the purported 2005-2006 Moscow Dynamo Contract.

Since then, Mr. Ovechkin, a 20 year-old only recently arrived in this country, continues to strive to overcome the distraction of being personally sued and faced with losing the right to play for anyone other than his former team in Russia.  He thus continues with his local civic involvement, including charity events, and tries to focus on his work.  (Sherwin Decl. Ex. 19.)

## OVERVIEW OF THE CONVENTION ON THE RECOGNITION
## AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

**A.    THE HISTORY OF THE CONVENTION**

Early U.S. jurisprudence frowned upon and refused to enforce arbitration agreements and arbitral awards. *See, e.g.*, *United States Asphalt Ref. Co. v. Trinidad Lake Petroleum Co.*, 222 F. 1006 (S.D.N.Y. 1915).  This changed domestically with Congress' enactment of the Federal Arbitration Act ("FAA") in 1925, which provided for enforcement of agreements providing for arbitration in the United States and recognition of awards rendered in arbitrations that took place in the United States.  The FAA does not apply to foreign arbitral awards, which United States courts remained reluctant to enforce.[6]  Internationally, various countries implemented measures, including bilateral and multilateral treaties, for the enforcement of foreign arbitral awards, but each of those endeavors was ineffective.

In the late 1950's, due in part to an ever-increasing growth in international trade, the United Nations facilitated the creation of an international agreement, entitled the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958.  21 U.S.T. 2517, 330 U.N.T.S. 38, No. 4739 (1958) (the "Convention").[7]  The Convention provides a set of rules governing the procedure for the recognition and enforcement of foreign arbitral awards.  The United States was not one of the Convention's original signatories because of, among other things, its initial concern that the Convention embodied principles of arbitration law that the United States would not find desirable to endorse.  *See* Ramona Martinez, *Recognition and*

---

[6]    *See Konstantinidis v. S.S. Tarsus*, 248 F. Supp. 280 (S.D.N.Y.) (noting that there was "no controlling authority" on whether U.S. courts had the power to enforce foreign arbitral awards), *aff'd*, 354 F.2d 240 (2d Cir. 1965).

[7]    The Convention is also referred to as the "New York Convention" because it was drafted, enacted, and opened for signature in New York City.

*Enforcement of International Arbitral Awards under the United Nations Convention of 1958:*

*The "Refusal" Provisions*, 24 INT'L LAW. 487, 491-92 (Summer 1990).

The United States eventually ratified the Convention in 1970, and Congress enacted implementing legislation, codified as Chapter II of the FAA, 9 U.S.C. §§ 201-08, providing jurisdiction in federal district courts for actions and proceedings falling under the Convention.  In ratifying the Convention, the United States agreed to recognize foreign arbitral awards "as binding and enforce them" but only "under the conditions laid down in the [Convention]." Convention, Arts. I and III.

In short, the Convention supplies the framework for the judicial review of "non-domestic" awards, *i.e.*, awards from arbitrations that took place outside the United States.[8]

**B.    ENFORCEMENT PETITIONS UNDER THE CONVENTION: THE JURISDICTIONAL PREREQUISITES OF ARTICLE IV**

The Convention contemplates two types of proceedings:  (1) an action to compel arbitration pursuant to an arbitration agreement falling under the Convention; and (2) an action to confirm an award made pursuant to an arbitration agreement falling under the Convention.  *See* 9 U.S.C. §§ 206, 207.[9]  The Convention, however, does not provide for wholesale recognition and enforcement of all foreign arbitral awards.  Rather, the Convention includes specific safeguards to ensure that an award falls within the scope of the Convention and was the result of an arbitral proceeding that did not violate the fundamental notions of due process and basic fairness.

With respect to enforcement actions, a court's analysis begins with Article IV of the Convention – and, by incorporation, Article II – which identifies the requirements a petitioner

---

[8]    In contrast, where an arbitration takes place within the United States, the FAA generally provides the regulations upon which the courts rely to recognize and enforce arbitration agreements and awards.  *See* Alan Scott Rau, *The New York Convention in American Courts*, 7 AM. REV. INT'L ARB. 213 (1996).

[9]    A party can only seek to vacate an arbitration award within the jurisdiction where the arbitration took place, which is why the Convention does not provide for vacatur proceedings.

must satisfy for a court to have subject matter jurisdiction to enforce the arbitral award.  To comply with Article IV(1), the petitioner must supply at the time of the application:  (a) a duly authenticated original award or a duly certified copy thereof; and (b) the original agreement to arbitrate referred to in Article II or a duly certified copy thereof.  Convention, Art. IV(1).  The agreement to arbitrate "referred to in Article II" must, among other things, be "in writing," which is defined to be "in an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams."  *Id*. Art. II(2).  That agreement must also not be "null and void, inoperative or incapable of being performed."  *See id.* Art. II(3).

If the party seeking enforcement meets its Article IV jurisdictional burden, then – and only then – does the burden shift to the respondent to overcome the presumption of a valid arbitration agreement and award by establishing grounds for one or more of the seven enumerated affirmative defenses set out in Article V of the Convention.  The Article V defenses to enforcement of a foreign arbitration award reflect the Convention's concern regarding due process and the fairness of the arbitral procedure.  Specifically, the first set of exceptions, listed in Article V(1), cover:  (a) the validity of the arbitration agreement; (b) the propriety of the respondent's notice; (c) the scope of the arbitration agreement; (d) the composition of the arbitral body; and (e) whether the award was vacated in the country where it was made.  Convention, Art. V(1).  The second set of defenses, listed in Article V(2), emphasize the issues concerning the fairness of recognizing the award in the country where enforcement is sought.  Article V(2) further permits courts to refuse to enforce a foreign award if:  (a) the award covers something not subject to arbitration in the country where recognition is sought; or (b) the arbitration or award violates the public policy of the country where recognition is sought.  *Id.* Art. V(2).

19

**C.    THE ABSENCE OF CASES SEEKING ENFORCEMENT UNDER THE CONVENTION OF SPORTS ARBITRATION AWARDS OR INJUNCTIONS FROM EMPLOYMENT**

The Court inquired at the status conference held on November 30, 2005 whether counsel is aware of any cases in the United States addressing enforcement under the Convention of either a foreign sports arbitration award or a foreign arbitration award enjoining an individual from being employed.  Counsel for Mr. Ovechkin has looked diligently for any such cases in the on-line databases, but has found none, let alone one addressing an award from the "Arbitration Committee of the Russian Ice Hockey Federation and Professional Hockey League."  The situation that Moscow Dynamo presents to this Court is apparently novel, and the grant of Moscow Dynamo's requested permanent injunction would apparently be unique.

The only two cases involving sports arbitration awards that even reference the Convention involved affirmative attempts by athletes to overturn arbitration decisions suspending them for violating drug policies, and neither were brought under the Convention, let alone for enforcement and recognition of an award.  In *Reynolds v. Int'l Amateur Athletic Fed'n*, the Sixth Circuit dismissed the athlete's action for lack of personal jurisdiction over the international sports organization.  23 F.3d 1110 (6th Cir. 1994).  And in *Slaney v. Int'l Amateur Athletic Fed'n*, the Seventh Circuit affirmed the district court's dismissal of the athlete's state-law contract and tort claims against the international sports organization.  244 F.3d 580 (7th Cir. 2001).

Similarly, only two cases were located involving recognition under the Convention of a foreign award that included injunctive relief, but both were in the context of corporate non-compete agreements, not enforcement of an individual's personal services contract.  In *Avraham v. Shigur Express Ltd.*, the award enjoined the petitioner from competing with respondent by providing courier services between New York and Israel.  1991 WL 177633 (S.D.N.Y. Sept. 4,

1991).  And in *Nat'l Educ. Corp. v. Martin*, the award, among other things, upheld the parties' "covenant not to compete" and enjoined the defendant from producing and/or distributing computer products for a specified period.  1995 WL 622267 (N.D. Ill. Oct. 20, 1995).

The absence of any similar cases simply highlights the novelty of the relief Moscow Dynamo seeks.  However, although there are no cases dealing with this factual situation, there are, as discussed below, many cases squarely holding that a petition for enforcement under the Convention should be dismissed for lack of subject matter jurisdiction where the underlying arbitration agreement is unsigned.

## ARGUMENT

## THIS COURT HAS NO SUBJECT MATTER JURISDICTION OVER MOSCOW DYNAMO'S PETITION TO CONFIRM THE PURPORTED ARBITRATION AWARD AGAINST MR. OVECHKIN

The threshold issue before this Court is whether it has subject matter jurisdiction over Moscow Dynamo's Petition to confirm its Award against Mr. Ovechkin. The answer is no.

For this Court to exercise subject matter jurisdiction here, Moscow Dynamo must tender a valid, applicable arbitration agreement *signed by the parties*. It has not done so, and no such document exists, as it has publicly admitted. Indeed, the purported 2005-2006 Moscow Dynamo Contract is not signed by anyone, much less by Mr. Ovechkin, and does not even appear to be a contract with Mr. Ovechkin, as his name appears nowhere on it. Moreover, that purported contract by its very terms explicitly requires that the player sign it of his "own free will" before it becomes effective, which certainly has not happened.

Additionally, there is no subject matter jurisdiction because Moscow Dynamo has not tendered a certified copy of the Award and has not tendered a certified copy of the purported arbitration agreement in the 2005-2006 Moscow Dynamo Contract, both of which the Convention expressly requires.

A. THE STANDARD FOR DETERMINING WHETHER SUBJECT MATTER JURISDICTION EXISTS TO ENFORCE A FOREIGN ARBITRAL AWARD UNDER THE CONVENTION

The Supreme Court of the United States has consistently held that federal courts "are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). *Accord Friends of the Earth v. United States Env't Protection Agency*, 333 F.3d 184, 187 (D.C. Cir. 2003) ("A federal court's subject-matter jurisdiction, constitutionally limited by Article III, extends only so far as the Congress provides by statute."). Indeed, "[i]t is presumed that a cause lies outside this

22

limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting

jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted).

Here, Moscow Dynamo seeks to invoke this Court's subject matter jurisdiction to

confirm the Award under the Convention pursuant to 9 U.S.C. § 203.  (Pet. ¶ 8.)  That section

provides, in pertinent part, that the "district courts of the United States ... shall have original

jurisdiction over" an "action or proceeding falling under the Convention."  9 U.S.C. § 203.  To

"fall under the Convention," Moscow Dynamo bears the burden of establishing the jurisdictional

prerequisites explicitly set forth in the Convention.  *Czarina, L.L.C. v. W.F. Poe Syndicate*, 358

F.3d 1286, 1292, n.3 (11th Cir. 2004); *Guang Dong Light Headgear Factory Co., Ltd. v. ACI

Int'l, Inc.*, 2005 WL 1118130, *4 (D. Kan. May 10, 2005) ("As the party seeking confirmation of

the arbitration award, Guang Dong bears the burden of proof with regard to subject matter

jurisdiction").

With respect to confirming arbitral awards, Article IV(1) of the Convention

unequivocally states that:

> To obtain the recognition and enforcement mentioned in the proceeding article,
> the party applying for recognition and enforcement *shall, at the time of the
> application, supply*:
>
> (a)    The duly authenticated original award or a duly certified copy thereof;
>
> (b)    The original agreement referred to in article II or a duly certified copy
> thereof.

Convention, Art. VI(1) (emphasis added).  Article II of the Convention, which is explicitly

incorporated into Article IV(1)(b), provides that:

> 1.    Each Contracting State shall recognize an agreement in writing under
> which the parties undertake to submit to arbitration all or any differences
> which have arisen or which may arise between them in respect of a
> defined legal relationship, whether contractual or not, concerning a subject
> matter capable of settlement by arbitration.

      2.      The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

      3.      The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

*Id.* Art. II.

Courts applying Article II(2) have held that the plain language of that provision "provides that an arbitration clause is enforceable only if it was contained in a signed writing or an exchange of letters." *Standard Bent Glass Corp. v. Glassrobots OY*, 333 F.3d 440, 449 (3d Cir. 2003). *Accord Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215 (2d Cir. 1999) ("definition of agreement in writing in the Convention requires that such an agreement, whether it be an arbitration agreement or an arbitral clause in a contract, be signed by the parties or contained in a series of letters or telegrams"); *Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.*, 109 F. Supp. 2d 1236, 1247 (S.D. Cal. 2000) ("both an arbitral clause and an agreement in writing must be found either in a signed writing or an exchange of letters under the Convention"); *Bothell v. Hitachi Zosen Corp.*, 97 F. Supp. 2d 1048, 1051-52 (W.D. Wash. 2000) ("pursuant to the Convention, both an arbitration clause in a contract or an arbitration agreement must be (a) signed by the parties or alternatively, (b) contained in a series of letters or documents to be enforceable"); *Sen Mar, Inc. v. Tiger Petroleum Corp.*, 774 F. Supp. 879, 882 (S.D.N.Y.

1991) ("[a]n arbitration clause is enforceable only if it is found in a signed writing or an exchange of letters").[10]

In short, the Article II agreement to arbitrate must be *in a writing signed by the parties to that agreement* or contained in an exchange of correspondence. Convention, Art. II(2). Also, it must: (a) cover the dispute submitted to arbitration; (b) not be null and void, inoperative or incapable of being performed; and (c) concern a subject matter capable of settlement by arbitration. Convention, Art. II(1) and (3).

A petitioner's failure to supply certified copies of the documents required by Article IV(1) of the Convention, and in particular the failure to supply a signed, written agreement to arbitrate in compliance with Article II, deprives the district court of jurisdiction to recognize the award. For instance, this Court in *Chromalloy Aeroservices v. Arab Republic of Egypt* confirmed that only after a petitioner has tendered the documents required by Article IV(1)(a) and (b) of the Convention is the party's petition to enforce such arbitral award "properly before this Court." 939 F. Supp. 907, 909 (D.D.C. 1996) (Green, J.). Similarly, this Court in *Compagnie d'Enterprises CFE, S.A. v. Republic of Yemen* granted default judgment on a petition to enforce an arbitral award under the Convention only after assuring itself that plaintiff had properly supplied the documents required by Article IV(1)(a) and (b). 180 F. Supp. 2d 12, 14 (D.D.C. 2001) (Urbina, J.). *See also Consorcio Rive, S.A. de C.V. v. Briggs of Cancun, Inc.*, 134 F. Supp. 2d 789, 794 (E.D. La. 2001) ("under the terms of the Convention and the enabling

---

[10]     In contrast to all other courts applying Article II(2), the Fifth Circuit alone holds that the phrase "signed by the parties" modifies only "an arbitration agreement" and not also "an arbitral clause in a contract." *Sphere Drake Ins. PLC v. Marine Towing, Inc.*, 16 F.3d 666, 669-70 (5th Cir. 1994). That holding has been consistently rejected outside of the Fifth Circuit based on careful analysis of the rules of statutory construction, examination of the Convention's provisions in the other official languages, and the Convention's legislative history. *E.g., Kahn Lucas*, 186 F.3d at 215-218. For example, "the rules of punctuation applied in construing statutes" provide that, "[w]hen a modifier is set off from a series of antecedents by a comma, the modifier should be read to apply to each of those antecedents." *Id.* at 215. To do otherwise "would render the comma [in Article II(2)] mere surplusage, a construction frowned upon." *Id.* at 217.

federal statute," the court only had "the authority to recognize and enforce the arbitral award at issue" where the petitioner had supplied the documents required under Article IV, including a copy of the agreement to arbitrate that complies with Article II), *aff'd*, 82 Fed. Appx. 359 (5th Cir. 2003).

Several other courts have made similar rulings. For example, in *Czarina*, a case strikingly similar to this one, the Eleventh Circuit recently addressed the issue of whether a district court has subject matter jurisdiction over a petition to confirm an arbitral award under the Convention where the plaintiff failed to provide the documents required under Article IV. Because the plaintiff failed to submit an arbitration agreement that was signed by the parties, the district court dismissed for lack of subject matter jurisdiction. 358 F.3d at 1290. The Eleventh Circuit affirmed and rejected the plaintiff's contention that the Convention does not require as a prerequisite to the court's subject matter jurisdiction that the proponent of an arbitration award meet Article IV(1)(b)'s requirement of providing a certified copy of the agreement that complies with Article II. *Id.* The Eleventh Circuit went on to cite and discuss several cases standing for the proposition that, "[w]here a party has failed to satisfy the agreement-in-writing prerequisite, courts have dismissed the action for lack of jurisdiction. And, when enforcing an agreement or confirming an award, courts first assure themselves of their jurisdiction by deciding whether the agreement-in-writing requirement has been met." *Id.* at 1291-92 (internal citations omitted). In conclusion, the Eleventh Circuit held that "*the party seeking confirmation of an award falling under the Convention must meet Article IV's prerequisites to establish the district court's subject matter jurisdiction to confirm the award.*" *Id.* at 1292 (emphasis added).

Similarly, in *Guang Dong*, the plaintiff moved to enforce an award that purported to grant it relief under fourteen separate sales contracts and to deny the defendant relief on its

counterclaims under a separate joint venture agreement.  2005 WL 1118130, *4-5.  Although the plaintiff tendered certified copies of the award and the sales contracts, it failed to provide a certified copy of a signed joint venture agreement.  *Id.* at *4  The court rejected the plaintiff's contention that it was not necessary to submit the written, signed arbitration agreement in the joint venture agreement, because such an interpretation "*would render [A]rticle IV of the Convention superfluous*, as an agreement to arbitrate would be unnecessary so long as an arbitration tribunal determined that the parties executed a valid agreement."  *Id.* at *4 (emphasis added).  Accordingly, the court held that it "lacks subject matter jurisdiction to confirm the arbitration award to the extent that it is claimed to adjudicate the rights and obligations of the parties under any Joint Venture agreement that may have existed."  *Id.* at *5.

In the analogous context of motions to compel arbitration under the Convention, courts have similarly required that a party tender a document complying with Article II as a prerequisite to the district court's subject matter jurisdiction.  For example, in *Bautista v. Star Cruises*, the Eleventh Circuit confirmed that the existence of an agreement in writing, as defined in Article II of the Convention, is a jurisdictional prerequisite for a district court to entertain a motion to compel arbitration under the Convention.  396 F.3d 1289, 1300 (11th Cir. 2005).

In *Kahn Lucas*, the Second Circuit reversed the district court's ruling compelling parties to arbitrate under agreements that were signed by only one of the parties, holding that, because the arbitration clauses in the contracts do not comply with Article II(2), they "are not enforceable under the Convention, and both the district court and this Court lack subject matter jurisdiction over the dispute."  186 F.3d at 215.  The court further explained that, "[b]ecause the dispute in

question does not fall within the Convention, subject matter jurisdiction cannot properly be premised on 9 U.S.C. § 203. *Id.* at 219.[11]

Also, in *Lo v. Aetna Int'l, Inc.*, the court held that, in order to determine whether it had subject matter jurisdiction over the defendant's motion to compel arbitration, the first question to be asked was whether there was an "'agreement in writing' to arbitrate the subject of the dispute." 2000 WL 565465, *3 (D. Conn. Mar. 29, 2000). In support of its motion, the defendant tendered an arbitration agreement signed by plaintiff only in her capacity as a trustee. However, the plaintiff's claim was not made in that capacity but rather as a beneficiary. *Id.* at *4. The court therefore held that, "[s]ince [defendant] has shown no written agreement to arbitrate these claims signed by [plaintiff] in her capacity as a beneficiary, the Court concludes that it lacks subject matter jurisdiction to compel arbitration under the Convention." *Id.* Additionally, in *Bothell*, the court found, among other things, that the documents defendants invoked to compel arbitration were not signed by both parties and, accordingly, held that it had no subject matter jurisdiction. 97 F. Supp. 2d at 1052, 1053-54.

In sum, Article IV of the Convention, which acts as a gatekeeper to the recognition and enforcement of foreign arbitral awards, requires dismissal where the petitioner has failed to

---

[11]   The Second Circuit's decision in *Khan Lucas* is described by the private on-line databases as having been partially abrogated by the decision of a different Second Circuit panel in *Sarhank Group v. Oracle Corp.*, but that is simply inaccurate. The panel deciding *Sarhank* did not have the authority to abrogate the decision of the panel that decided *Khan Lucas*. Moreover, the discussion of *Khan Lucas* in *Sarhank* is mere dicta contained in a footnote. 404 F.3d 657, 660, n.3 (2d Cir. 2005). Furthermore, *Sarhank* did *not* hold that a court has jurisdiction over a petition to enforce an award even if the petitioner did not supply documents that on their face comply with Article IV(1)(a) and (b) of the Convention. Indeed, the opinion itself suggests that the petitioner (unlike Moscow Dynamo) did submit the requisite Article IV documents, *i.e.*, the award and a written agreement, containing an arbitral clause, that was signed by the parties to that agreement and that covers the dispute submitted to arbitration. *Id.* at 660. Rather, unlike the issue before this Court, *Sarhank* addressed the separate issue of whether a parent corporation could be bound by a foreign arbitral award under an agency theory where its wholly-owned subsidiary entered into the written, signed arbitration agreement. All the panel in *Sarhank* held was that that issue is properly asserted as an affirmative defense under Article V, rather than as a threshold subject matter jurisdiction matter. *Id.* at 661-62.

tender a certified copy of the award and a certified copy of a *signed* arbitration agreement that is applicable to the dispute and valid on its face.

**B.    THERE IS NO SUBJECT MATTER JURISDICTION HERE BECAUSE THE PURPORTED 2005-2006 MOSCOW DYNAMO CONTRACT IS UNSIGNED**

The 2005-2006 Moscow Dynamo Contract does not comply with the requirements of Articles II and IV because *it is not signed by the parties to that purported agreement*, *i.e.*, Moscow Dynamo and Mr. Ovechkin.  (2005-2006 Moscow Dynamo Contract (Sherwin Decl. Ex. 1).)[12]  Indeed, it is not signed by either party.  That fatal defect to this proceeding is evident on the face of that document.  That defect is dispositive.

Moreover, the purported contract, on its face, does not even appear to be a contract with Mr. Ovechkin.  In fact, Mr. Ovechkin's name (like his signature) *appears nowhere in the document*.  For example, whereas the first page of the 2004-2005 Moscow Dynamo Contract specifically defines "Alexander Mikhailovich Ovechkin" as the Professional Player, the corresponding space for the player's name on the purported 2005-2006 Moscow Dynamo Contract is blank.  (*Compare* 2004-2005 Moscow Dynamo Contract at 1 (Pet. Ex. B, Supp. 1, doc. 1) *with* 2005-2006 Moscow Dynamo Contract at 1 (Sherwin Decl. Ex. 1).)

Further, because it is not signed, the purported agreement *even by its own terms* is not valid.  The plain language of the purported 2005-2006 Moscow Dynamo Contact requires Mr. Ovechkin's repeated signature in order to be valid and effective:

- On the first page, there is a notice that provides:  "IMPORTANT NOTICE TO PLAYER *Before signing this Contract*, you should carefully examine it to be sure that all terms and conditions agreed upon have been included herein, and you understand its content and

---

[12]    Furthermore, the President of Moscow Dynamo repeatedly admitted in the press that Moscow Dynamo has no signed agreement with Mr. Ovechkin for the 2005-2006 season.  (Sherwin Decl. Ex. 8.)

interpretation." (2005-2006 Moscow Dynamo Contract at 1 (Sherwin Decl. Ex. 1) (emphasis added).)

- At the bottom of *each page*, there is a line for the hockey club to sign and a line for the player to sign. Neither supposed party signed *any page* of the purported 2005-2006 Moscow Dynamo Contract. (*Id.*)

- Although the purported contract is missing its last page, it appears that there would be paragraph 8.2 that would provide that: "The professional Player agrees and declares that he had an opportunity to study the documents specified in Articles 3.3 and 3.29 of the present Contract *before signing*." (*See, e.g.*, 2004-2005 Moscow Dynamo Contract ¶ 8.2 (Pet. Ex. B, Supp. 1, doc. 1) (emphasis added).)

- Similarly, there would apparently be a paragraph 8.3 that would provide, in pertinent part, that "*the Contract comes into effect the moment it is signed.*" (*See, e.g.*, *id.* ¶ 8.3 (emphasis added).)

- And the final paragraph of the purported agreement would apparently provide: "Having read the present Contract, the Club and the Player agree that all the terms and obligations of the Contract as well as their interpretation are clear to them. All parties to this Contract had an opportunity to discuss all terms and obligations with their attorneys, physicians, agents and other representatives *and the Contract is signed of their own free will.*" (*See, e.g.*, *id.* at 7 (emphasis added).)

Given the foregoing, the lack of Mr. Ovechkin's signature anywhere on the purported 2005-2006 Moscow Dynamo Contract, let alone everywhere it was needed, is telling. For this reason, the purported contract also does not satisfy the requirement of Article II(3) that it not be "null and

void, inoperative or incapable of being performed," as by its terms it was never valid, operative, or capable of being performed.

In sum, Moscow Dynamo asks this Court to enforce a foreign arbitral award in the Untied States based on an alleged contract that was never signed, that on its face does not even purport to be a contract with Mr. Ovechkin, and that was never operative by its express terms. Consistent with fundamental concepts of due process and basic fairness, Articles II and IV of the Convention simply do not allow that. Moscow Dynamo may be able to try to do something with its "arbitral award" in Russia where it was rendered, but plainly cannot bring it to the United States and try to have it enforced under the Convention. This Court should dismiss this proceeding for lack of subject matter jurisdiction.

C.    **THERE IS NO SUBJECT MATTER JURISDICTION HERE BECAUSE MOSCOW DYNAMO FAILED TO PROVIDE THE REQUIRED CERTIFIED COPIES**

Moscow Dynamo has failed to do even what it should, ostensibly, be able to do and what it was required by the express language of Article IV(1)(a) and (b) to have done *at the time of filing*: provide a certified copy of the award and of the purported 2005-2006 Moscow Dynamo Contract. For this independent reason, the Petition should be dismissed for lack of subject matter jurisdiction.

It is undisputed that Moscow Dynamo has not tendered any certification of the purported Award. Instead, it merely attached a copy of the Award that is not certified by anyone, let alone a proper person. (Award (Pet. Ex. A).) That failure is particularly problematic because Mr. Ovechkin did not participate in the arbitration in any manner and thus has no personal ability to gauge the authenticity of the purported Award.

Additionally, it is undisputed that Moscow Dynamo has not tendered any certification of the purported 2005-2006 Moscow Dynamo Contract. Indeed, the uncertified copy it did attach is

31

incomplete on its face, clearly missing at least its last page. Here, again, Mr. Ovechkin is in no position to confirm the authenticity of that document, having never negotiated or executed it.

During the November 30, 2005 status conference, counsel for Moscow Dynamo mentioned that it had provided certified translations of the various documents with its Petition. Although certified *translations* of non-English documents are required by Article IV(2), that is a separate requirement that is in addition to – not in place of – the requirement under Article IV(1) to tender certified *copies* of the key documents. The requirement to certify copies serves to ensure the authenticity of the key documents being tendered to the court, and that is not satisfied by a translator's certification. Acceptable certifications under Article IV(1) include: (a) a certification of the award through the affidavit of the chair of the arbitration panel; (b) an authentication certificate, signed by a consular officer, and a notarized certification that the copies of the award are true and correct; and (c) a certification of the award by a magistrate in the country in which the arbitration was held. *See Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 934 (2d Cir. 1983); *Guang Dong*, 2005 WL 1118130 at *4; *NAR S.p.A. Industria Nastri Adesivi v. I.R. Indus.*, 5 F. Supp. 2d 203, 204 (S.D.N.Y. 1998).

Further, it is somewhat ironic that Moscow Dynamo has yet to submit the certifications that it was plainly required to file with its Petition *three weeks ago*, even though Moscow Dynamo repeatedly pressed this Court to shorten Mr. Ovechkin's time to respond to the Petition and to short-circuit his ability to have this Court determine whether it even has subject matter jurisdiction before proceeding to the costly effort of presenting and establishing his numerous factual and legal affirmative defenses to enforcement of the award.

This Court should thus dismiss the Petition for the independent reason that Moscow Dynamo failed to provide the certified copies that the Convention requires.

32

## CONCLUSION

Respondent Alexander M. Ovechkin respectfully requests that this Court dismiss

Moscow Dynamo's Petition to enforce the Award for lack of subject matter jurisdiction pursuant

to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Dated:          December 9, 2005

                                          Respectfully submitted,


                                          /s/ Peter J.W. Sherwin_____
                                          Peter J.W. Sherwin (admitted *pro hac vice*)
                                          Steven H. Holinstat (*pro hac* pending)
                                          Edward T. Werner (admitted *pro hac vice*)
                                          PROSKAUER ROSE LLP
                                          1585 Broadway
                                          New York, NY  10036-8299
                                          Phone:  212.969.3261

                                                  -and-

                                          /s/ Robert M. Bernstein_____
                                          Robert M. Bernstein (D.C. Bar No. 490166)
                                          PROSKAUER ROSE LLP
                                          1233 Twentieth Street NW, Suite 800
                                          Washington, DC  20036-2396
                                          Phone: (202) 416-6800

33