IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOSCOW DYNAMO | * |
| Petitioner | * |
| v. | *   CIVIL ACTION NO. 05-2245-EGS |
| ALEXANDER M. OVECHKIN | * |
| Respondent | * |

\* \* \* \* \* \* \* \* \* \* \*

PETITIONER'S RESPONSE TO
MOTION TO DISMISS THE PETITION
FOR LACK OF SUBJECT MATTER JURISDICTION

Petitioner, Moscow Dynamo, by its undersigned attorneys, files this Response to the Motion to Dismiss the Petition for Lack of Subject Matter Jurisdiction filed by the respondent, Alexander M. Ovechkin.

INTRODUCTION

On November 18, 2005, Moscow Dynamo filed a Petition for Confirmation of Arbitration Award and for Permanent Injunctive Relief ("Petition") by which it sought to enforce an arbitration award entered on October 21, 2005 (the "Award") by the Arbitration Committee (the "Arbitration Committee") of the Russian Professional Hockey League ("PHL") and the Russian Ice Hockey Federation ("RIHF"). The petition was filed pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, No. 4739 (1958), reprinted in 9 U.S.C.A. § 201 note (the "Convention").

Respondent Alexander M. Ovechkin ("Ovechkin") has moved to dismiss that petition, asserting that this Court does not have subject matter jurisdiction in this

proceeding. The principal ground for the respondent's motion is the claim that there is no written document, signed by Ovechkin, that evidences his agreement to arbitrate the dispute that gives rise to this action.[1] But, as discussed below, there is such an agreement, and it is found in the papers filed with the petition. In his supporting memorandum, the respondent cites, relies on, and attaches an admittedly unsigned document that accompanied the petition; but he does not attach, cite, or even acknowledge the existence of the signed documents that underpins Moscow Dynamo's claim in this case. Moreover, and tellingly, the respondent does not assert (by affidavit or even proffer) that he did not sign an agreement to arbitrate disputes relating to his PHL contracts. That, presumably, is because he knows that he did--both his 2004-2005 contract with Moscow Dynamo and his 2005-2006 contract with the Avangard Omsk PHL hockey club (which contract Moscow Dynamo matched, thereby establishing the terms of the agreement in this case) consisted of, among other terms, the PHL Standard Player's Contract, which expressly and unequivocally mandates the arbitration of disputes. Because there is an agreement to arbitrate that satisfies the Convention, the motion to dismiss should be denied.

## PROCEDURAL BACKGROUND

At the status conference on Wednesday, November 30, 2005, Moscow Dynamo attempted to impress on this Court the urgency of these proceedings and the need to bring this matter promptly to resolution, considering the time-sensitive nature of the injunctive relief granted by the Arbitration Committee. When counsel for the respondent argued

---

[1] The motion also argues that the petition is procedurally defective because it does not attach authenticated copies of either the arbitration award or of the agreement to arbitrate. As discussed below at part II, that alleged defect has been or will be corrected.

#494193v.1                                        2

that Ovechkin wished to make a preliminary motion to dismiss before responding on the merits, Moscow Dynamo's counsel objected and urged the Court to require the respondent to answer the petition immediately, and not to permit the respondent to delay this matter by bifurcating his responsive papers.  The Court first agreed, entering an order requiring the respondent to move and respond to the petition by December 6, 2005, but, a short while later, entered a new order and required the respondent only to file its dismissal papers on that date.

A review of the respondent's motion to dismiss and its supporting memorandum demonstrates that Moscow Dynamo's concerns about delay were well founded.  While the respondent's lengthy memorandum ultimately attempts to address the applicable legal issues (beginning on page 22), the bulk of the memorandum contains a recitation of the respondent's proffer of the facts surrounding his career and his dealings with his employers.  That discussion foreshadows the respondent's strategy: first, to concoct a host of alleged issues;[2] then to argue that discovery (including discovery in Moscow) is required;[3] and, finally, to extend these proceedings, thereby effectively denying and mooting the relief granted in the Award.

To avoid such an unwarranted result, and assuming that the pending motion is denied, Moscow Dynamo urges the Court immediately to address the merits of this enforcement proceeding.  If this matter is further delayed by unnecessary briefing and discovery, then Moscow Dynamo, in the interim, should have the benefit of its injunction

---

[2]    See Memorandum of Law of Respondent Alexander M. Ovechkin in Support of his Motion to Dismiss the Petition for Lack of Subject Matter Jurisdiction ("Ovechkin Memorandum") at 2 (if the motion is denied the parties will need to "proceed to [deal with] fact-intensive affirmative defenses").

[3]    See Respondent Ovechkin's Memorandum in Support of his Motion to Extend Time to Respond to Petitioner's Petition and in Opposition to Petitioner Moscow Dynamo's Motion to Shorten Time, Docket Entry 9, at 2. ("Complicating matters further, some witnesses are outside of the United States including Russia").

pending a final resolution, particularly since the Rules anticipate that this enforcement proceeding be summary (and prompt) in nature.  See e.g., Imperial Ethiopian Gov't v. Baruch-Foster Corp., 535 F.2d 334, 335 (5th Cir. 1976) (to advance the objectives of the Convention, "the implementing legislation prescribed a summary procedure in the nature of federal motion practice to expedite petitions for confirmations of foreign arbitral awards").[4]  Moscow Dynamo intends, in that circumstance, to seek immediate interim injunctive relief.[5]

## THE RESPONDENT'S FACTUAL BACKDROP IS IRRELEVANT, BUT DEMONSTRATES HIS DISREGARD FOR HIS CONTRACTUAL OBLIGATIONS

The bulk of the respondent's support memorandum concerns itself with Ovechkin's view of the "facts" surrounding the petition (presumably designed to persuade the Court that dismissal is risk-free because the respondent will ultimately prevail).  The memorandum alleges that Ovechkin is a rising hockey star, that he was the first player selected in the 2004 National Hockey League ("NHL") draft, that he signed an agreement with Avangard Omsk in the Russian Professional Hockey League in June 2005 (the "Avangard Contract"), that Moscow Dynamo matched that contract (under

---

[4] At the status conference, respondent's counsel attempted to make much of the fact that Moscow Dynamo had not sought an injunction in aid of arbitration from this Court prior to the arbitration proceeding.  The short answer to that point is that there was no jurisdiction in this Court until the enforcement action was ripe for filing--this Court has no jurisdiction (independent of the Convention as implemented by Chapter II of the Federal Arbitration Act ("FAA")) to resolve a dispute between two citizens of the Russian Federation.  And, as fully addressed at the hearing, once the arbitration Award was issued and duly translated (with the other required documents)--a task that was not completed until November 15, 2005, see Certified Translator's Declaration located at first page, Pet. Exh. B--Moscow Dynamo immediately filed its petition to enforce, commencing a "summary" process that is supposed to be swift.  In short, the petitioner has acted with dispatch to protect its position in this matter.

[5] Moreover, such injunctive relief is particularly appropriate here, since the injunctive relief is already ordered in the arbitration Award itself and should thus be enforced by this Court.  Notably, the power to issue injunctive relief in this arbitration Award is not based on a discretionary remedy created by the arbitration tribunal, but is founded directly upon and is authorized by the dispute resolution clause 6 of the PHL Standard Player's Contract.

applicable PHL rules), that he purported to exercise a "null and void" provision of the Avangard Omsk contract on July 20, 2005, and that, according to press reports, representatives of both Avangard Omsk and Moscow Dynamo took the public position that Ovechkin was not bound to any Russian hockey team at that point. Ovechkin Mem. at 5-11. From those assertions, Ovechkin argues that his contract with Avangard Omsk was null and void, that the "matching" offer from Moscow Dynamo was similarly null and void, and, therefore, that he had no contractual obligations to Moscow Dynamo.

What all of those alleged facts demonstrate, though, is that the petitioner's claim in this case implicates, and is controlled by, the rules that govern professional hockey in Russia, including: the regulations of the PHL, the terms of the mandatory Standard Player's Contract applicable to PHL players, and the contracts signed by (in his case) Ovechkin in Russia.[6] It is precisely because of the interplay of these regulations and contracts, that Ovechkin (together with every other PHL player) is a party to a Standard Player's Contract that mandates that disputes be determined by the Arbitration Committee of the PHL and the RIHF--an arbitration tribunal that has expertise and understanding of these contracts and the applicable league rules.

Ovechkin's problem, of course, is that, notwithstanding that he and his representatives all had notice that Moscow Dynamo intended to arbitrate this proceeding, and were aware of the date, time, and place of the proceeding, he decided not to contest Moscow Dynamo's arbitration claim. Indeed, Ovechkin does not dispute that he and his

---

[6] The PHL rules, and its standard contracts, are similar to those of the National Hockey League ("NHL"). Thus, in the NHL the petitioner understands that there is a standard player's contract, there is mandatory arbitration of disputes, and teams have "matching rights" that require only the matching of financial terms. To the petitioner's knowledge, the NHL has never taken the position that an NHL Standard Player's Contract, entered into through the matching process, is unenforceable internationally.

representatives ignored the proceedings until he was served with the petition in this case. That, of course, was Ovechkin's right, but he did so at his peril. All of the issues raised by Ovechkin, both the principal issue in the pending motion and all of the issues that are signaled by his factual recitation, could and should have been raised by Ovechkin to the Arbitration Committee, and then (if he so chose) in the Court of Arbitration for Sports, a higher Russian arbitration tribunal. Ovechkin should not now be permitted collaterally to attack the Award.

Indeed, whether Moscow Dynamo successfully and properly exercised its matching rights was <u>precisely</u> the issue that was raised by Moscow Dynamo's arbitration statement of claim, and adjudicated by the Arbitration Committee. And, the existence <u>vel non</u> of an agreement between Moscow Dynamo and Ovechkin to arbitrate their dispute was also an issue that was addressed fully by the Arbitration Committee. Ovechkin should not be heard here to complain, when he decided not to challenge Moscow Dynamo's claim in the forum of the parties' choice.

Apparently recognizing that his tactical decision to ignore the arbitration proceeding has resulted in a waiver of whatever substantive defenses he may have had in the arbitration, Ovechkin now asserts that he intends to challenge in this Court the bona fides of the Arbitration Committee itself, and has made conclusory allegations of bias and lack of independence.[7] <u>See</u> Ovechkin Mem. at 2, 11-15. But that, too, is an issue that,

---

[7] Contrary to Ovechkin's suggestion, the PHL's arbitration processes are sophisticated and created to ensure fairness and due process. <u>See e.g.</u>, Rules attached to Pet. Exh. E (Berkovich Aff.), also attached here as Exhibit A. In any event, however, bias and corruption are <u>not</u> defenses to enforcement proceedings under the Convention. <u>See</u> Convention Art. V (stating the limited grounds--not including bias and corruption--under which a court may refuse to enforce an award). The exclusion of bias and corruption as a defense under the Convention is probably because the drafters concluded that it would be too easy for a respondent to allege that a foreign proceeding was corrupt, hoping that the enforcing court would intuitively believe that to be the case and refuse to enforce an award. <u>Cf</u>. 9 U.S.C. § 10 (expressly providing for the defenses of bias and corruption in enforcement proceedings under Chapter I of the FAA).

under the rules that Ovechkin agreed to follow when he signed his PHL contracts, he agreed would and should be addressed to the Arbitration Committee.  That committee's Rules <u>expressly</u> provide a process by which a party to an arbitration proceeding may challenge any arbitrator:

> Article 8.    Challenge of Members of the Arbitration Committee
>
> The persons participating in the hearing of a claim shall have the right to challenge any Member of the Arbitration Committee if he/she is personally, directly or indirectly interested in the outcome of the case, or has other circumstances which raise questions about his/her impartiality.

<u>See</u> Rules, Exh. A, at Art. 8.  Moreover, Ovechkin had the right to appeal the Award to the Court of Arbitration for Sports, and declined to do so.  <u>See</u> <u>id.</u> at Art. 20.[8]

While Ovechkin chose to ignore his PHL contracts and decided to let the arbitration proceeding go forward without the benefit of his arguments, he now is seeking to challenge collaterally the decision of the Arbitration Committee.  In doing so, Ovechkin would implicitly have this Court ignore the presumption in favor of arbitration recognized by the United States Supreme Court, <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24-26 (1983), which presumption applies "with special force" when dealing with international arbitration agreements and application of the Convention.  <u>See</u> <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 631 (1985); <u>Scherk v. Alberto-Culver Co.</u>, 417 U.S. 506, 520 n.15 (1974) (noting that the "goal of the Convention, and the principal purpose underlying American

---

[8] Exhibit A includes the Rules for both the Arbitration Committee and for the Court of Arbitration for Sport.  For the Court's convenience, and with one exception discussed below, only the English translations of petition exhibits cited here, are attached to this memorandum.  The Russian version of the Rules is Exh. B to the Berkovich Affidavit, Pet. Exh. E.

#494193v.1                                    7

adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate" are enforced). His challenge should not succeed.

## ARGUMENT

I. **THE PARTIES' AGREEMENT TO ARBITRATE IS IN WRITING AND SATISFIES THE CONVENTION.**

Ovechkin's position that there is no written agreement to arbitrate either demonstrates a failure to understand the documents attached to, and the analysis in, the petition, or manifests an intentional obfuscation of the issue before the Court. Ovechkin's point is premised on the notion that Ovechkin has signed nothing, and that the petitioner is relying on an unsigned copy of the PHL Standard Player's Contract to demonstrate the required written agreement. It also assumes that, to satisfy the Convention, there must be a single document, signed by both parties, containing an arbitration provision. Both premises are wrong--the first as a factual matter and the second as a matter of law.

    A. **Ovechkin Agreed, in Writing, to Arbitrate this Dispute.**

Contrary to Ovechkin's unexplained assertions found throughout his support memorandum, Moscow Dynamo is <u>not</u> relying on the unsigned Standard Player's Contract as being the document that is <u>the</u> "contract" between the parties, and never made such an argument in the petition.[9] The petition and its exhibits clearly state the factual

---

[9] There is no basis for Ovechkin's assertion that the Standard Player's Contract, attached as Exhibit 1 to the Declaration of Peter J.W. Sherwin, Esq., "is a copy of what Moscow Dynamo attached to the Petition as the purported 2005-2006 Moscow Dynamo Contract . . . ." That (blank) version of the Standard Player's Contract, along with a certified translation, was presented to demonstrate the complete terms of the PHL Standard Player's Contract for the 2005-2006 PHL season. Those terms apply, then, to the contract between Moscow Dynamo and Ovechkin for the 2005-2006 season, which came into effect (as explained <u>infra</u>) on July 1, 2005, when Moscow Dynamo matched the Avangard Contract.

predicate that underpins Ovechkin's obligation to arbitrate this dispute. By way of summary: the Avangard Contract is signed by Ovechkin, and is on the Standard Player's Contract form; the Standard Player's Contract contains a mandatory arbitration provision; the PHL regulations <u>require</u> that player contracts be on the Standard Player's Contract form; and Moscow Dynamo matched, and obtained the contract rights embodied in the Avangard Contract with Ovechkin, first by making a signed qualifying offer to Ovechkin, and then by making a signed matching offer to Avangard, matching the economic terms of the Avangard contract.[10] Under the controlling law, discussed in part I.B. below, those documents establish the written arbitration agreement anticipated by the Convention.

As explained in the petition, Ovechkin played hockey with Moscow Dynamo for the 2004-2005 PHL season pursuant to a contract dated July 1, 2004. That contract was on the mandatory Standard Player's Contract form (which included a provision requiring arbitration of disputes), as required by the PHL. A copy of that contract was attached to the petition as Exhibit B, Supplement 1, and is attached here as Exhibit B. That contract, signed by both Ovechkin and Moscow Dynamo, expired on April 30, 2005. By letter dated April 26, 2005, Moscow Dynamo offered Ovechkin a new contract for the 2005-2006 hockey season with a 30% raise. A copy of the letter making that offer was attached to the petition as Exhibit B, Supplement 3, and is attached here as Exhibit C. That offer constituted a "qualifying offer" under the regulations of the PHL, permitting Moscow Dynamo to retain "matching rights" with respect to Ovechkin, should he sign a contract

---

[10] As fully explained in the petition, and as found by the Arbitration Commission, Moscow Dynamo was <u>not</u> required to match the "null and void clause" (as Ovechkin describes it) because that was a non-economic term. <u>See</u> discussion and cited exhibits at Petition ¶ 14.

with another PHL club for the 2005-2006 season. A copy of those regulations was attached to the petition as Exhibit B, Supplement 2, and is attached here as Exhibit D.

At that point, nothing compelled Ovechkin to enter into an agreement with Moscow Dynamo or with any other PHL team. But, when Ovechkin freely chose to enter into a signed contract with Avangard for the 2005-2006 PHL season--a one-year PHL Standard Player's Contract--he then bound himself to comply with all of the rules and regulations of the PHL for that season, as those regulations were expressly incorporated by reference in the Avangard Contract. A copy of the Avangard Contract was attached to the petition as Exhibit B, Supplement 4, and is attached here as Exhibit E.[11] Ovechkin and Avangard also entered into a "Confidential Addendum to the Avangard Contract," which contained a compensation provision in the amount of $1,800,000 USD for the 2005-2006 season, and gave Ovechkin the right to terminate the contract, and be freed of all obligations to Avangard, if, and only if, he accepted a contract offered by an NHL team before midnight, Eastern U.S. time zone, on July 20, 2005. A copy of that addendum was attached to the Petition as Exh. B, Supplement 5, and is attached here as

---

[11]   The English translation of the Avangard contract (Exhibit E) is an abbreviated version, omitting paragraphs 3.1 to 8.3. That is because the petitioner's original Russian version included only the first two pages, and the last (signature) page of the same PHL Standard Player's Contract. A copy of the Russian language version is attached as Exhibit F. That reflects the practice of the PHL clubs and league only to send those key pages (containing the terms and signatures), and not including the other standard terms, when exchanging contract documents. The parties, nonetheless, understand, and the PHL regulations require, that all of the terms of the Standard Player's Contract apply--a point not contested by Ovechkin. Indeed, Ovechkin's memorandum relies on language in the PHL Standard Player's Contract to make the point that the Avangard Contract contains standard language regarding termination. See Ovechkin Mem. at 7.

Exhibit G. That addendum, while of relevance to the merits,[12] has no bearing on the jurisdictional issue raised in Ovechkin's motion.

Under the PHL regulations, which, again, are incorporated by reference in the Avangard Contract and which are binding on all teams and players in the PHL, "matching rights" permit a team that makes a qualifying offer to a player (the "former team," here Moscow Dynamo) to match the economic terms of an offer that is made by another PHL team and accepted by the player. When the former team matches such an offer (as Moscow Dynamo did here), the former team and the player become parties to a binding PHL Standard Player's Contract, and the player is bound to play for the former team (Moscow Dynamo) for the term of the matched contract. See Exh. D (PHL Regulations at ¶ 1.10).

That a contract for the 2005-2006 hockey season exists between Moscow Dynamo and Ovechkin, as already determined by the Arbitration Committee, is not a complex point. Ovechkin, represented by top sports agents, well knew when he signed the Avangard Contract that he was obligated to arbitrate disputes arising out of the contract, that Moscow Dynamo had a right to match the Avangard contract and, if it did,

---

[12] Ovechkin claims that the Confidential Addendum attached to Moscow Dynamo's petition was imprecisely translated and that the "original" English version required that he "accept an Offer to Contract" from the NHL team by July 20, 2005. See Ovechkin Mem. at 6 n.5. In contrast, the petitioner's certified translation calls for the player to "accept the contract offered" and states that the contract "becomes effective on July 21, 2005 only in case the player does not sign the agreement with the NHL club." Exh. G at ¶¶ 2, 5. Other than relying on an alleged draft of the document in English, however, Ovechkin does not actually translate the Russian addendum (the one signed by and binding on him) or explain that the certified translation attached to Moscow Dynamo is wrong. If Ovechkin has a translation, and it actually supports his view that merely an "Offer to Contract," as opposed to a signed contract with the Washington Capitals, was required for Ovechkin to opt out of the contract, that point would have been made in his motion. In any event, the arbitration panel found not only that the opt-out provision was irrelevant because it was not a financial term, but that Ovechkin had not come to terms with the Washington Capitals until August 5, 2005 (based on public statements by the Washington Capitals).

then he would be bound to play for Moscow Dynamo. And there is no dispute that on July 1, 2005, Moscow Dynamo sent a letter to Avangard (copied to the PHL) timely exercising its matching rights with respect to Ovechkin by offering him financial terms matching those set out in the Avangard Contract. A copy of Moscow Dynamo's July 1, 2005, letter was attached to the petition as Exhibit B, Supplement 6, and is attached here as Exhibit H. A copy of the PHL minutes explaining the need to match only financial terms was attached to the petition as Exhibit B, Supplement 9, and is attached here as Exhibit I. As the Arbitration Committee determined and adjudicated, Moscow Dynamo's matching of the financial terms in the Avangard Contract created a binding agreement between Ovechkin and Moscow Dynamo for the 2005-2006 hockey season that incorporated and was subject to the regulations of the PHL. That agreement, and the PHL regulations, unequivocally require that disputes between a player and a club be arbitrated before the Arbitration Committee.

> **B.    Application of Contract Law, and the Convention, Establishes the Presence of an Arbitration Agreement.**

The suggestion in Ovechkin's papers that the arbitration agreement must be one stand-alone document, signed by both parties, is simply wrong.

Article II (1) of the Convention provides that "[e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them . . . ." Article II(2) of the Convention explains that "'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, <u>signed by the parties or contained in an exchange of letters or</u> telegrams." (Emphasis added.). Although Ovechkin accurately cites these provisions of the Convention, his analysis of how courts

have interpreted them is misleading, as it neglects to acknowledge that basic contract law principles apply when courts determine whether an arbitration agreement satisfying the Convention is present.

"Courts interpreting the Convention's 'agreement in writing' requirement have generally started their analysis with the plain language of the Convention . . . and have then applied that language in light of federal law, which consists of generally accepted principles of contract law . . . ." Filanto, S.p.A. v. Chilewich Int'l Corp., 789 F. Supp. 1229, 1237 (S.D.N.Y. 1992) (citing Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 845-46 (2d Cir. 1987)).  Thus, in determining whether an arbitration agreement exists, "ordinary principles of contract . . . law" should be applied.  See Smith/Enron Cogeneration L.P. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 97 (2d Cir. 1999); Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995).  The doctrines of "incorporation by reference" and "estoppel" are but two of the ordinary principles of contract law that may be used to mandate that a party arbitrate a dispute pursuant to the Convention.  Smith/Enron, 198 F.3d at 97 (citation omitted).

With respect to the required legal analysis to determine whether Article II's agreement requirement has been satisfied here, Ovechkin merely cites cases that stand for the proposition that when no signed writing or no series of letters containing an agreement to arbitrate is presented, there is no subject matter jurisdiction.  Moscow Dynamo has no quarrel with those cases, which, although they accurately state the law, are factually inapposite to the present action.  See e.g., Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd., 186 F.3d 210, 217 (2d Cir. 1999) (no arbitration agreement when the party that the defendant sought to compel to arbitrate matter had not signed arbitration

agreement); Bothell v. Hitachi Zosen Corp., 97 F. Supp. 2d 1048, 1051-52 (W.D. Wash. 2000) (refusing to compel arbitration under the Convention, after analyzing documents "between the parties," because the arbitration clause "was not unequivocally incorporated in any of the 'series of documents' exchanged between" the parties); Sen Mar, Inc. v. Tiger Petroleum Corp., 774 F. Supp. 879, 882-83 (S.D.N.Y 1991) (refusing to compel arbitration based on arbitration clause in telex order form, because the clause was not found in a signed writing or in an exchange of letters; in fact, the party that responded to the telex disavowed the entire contents of the original telex).

In each of those cases, the court concluded that, as a matter of contract law, there was no binding agreement to arbitrate. But, when contract law principles demonstrate--as here--the existence of an arbitration agreement between the parties, courts do not hesitate to find that Article II's requirements have been met and that subject matter jurisdiction is proper. For example, in Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440 (3d Cir. 2003), cited by Ovechkin, the Second Circuit affirmed the district court's holding that the parties were required to arbitrate their dispute, even though no signed arbitration agreement existed between the parties. Id. at 449-50. In that case, the plaintiff, a domestic equipment buyer, had entered into a contract with the defendant, a Finnish manufacturer. The parties engaged in a lengthy series of negotiations, which resulted in the defendant sending a cover letter, invoice, and standard sales agreement to the plaintiff. Id. at 442-44. The standard sales agreement incorporated by reference industry guidelines that provided for binding arbitration for all contractual disputes, and also contained a reference to binding arbitration. Id. at 444. The plaintiff faxed a return letter

to Glassrobots, which accepted the standard sales agreement and requested several specific changes, none of which were related to arbitration.  Id. at 442.

After a dispute arose between the parties, the plaintiff filed suit in state court and the defendant removed the case to federal district court and moved to compel arbitration under the Convention, and the district court granted the motion.  Id. at 443.  On appeal, the court addressed whether the Convention applied absent an "agreement in writing."  Id. at 449.  Adopting the rationale of the Second Circuit in Kahn Lucas Lancaster, supra, the Third Circuit recognized that the Convention's plain language provides that an arbitration clause is enforceable if it was "contained in a signed writing or an exchange of letters."  Id. at 449.  The court went on to note that beyond the clear prohibition against an oral agreement in the Convention, the Convention "does not require a signed writing-- the agreement in writing to an arbitral clause may be unsigned if it is exchanged in a series of letters."  Id. at 449 n.14 (emphasis added.).

Because it was not faced with an "agreement in writing," the Third Circuit looked to whether an arbitration clause was incorporated in the series of documents exchanged between the parties.  Id. at 449-50.  It found that it was, and that, even though an express arbitration clause "may not have been included in that exchange, . . . it was incorporated by reference in the letters."  Id. at 450.  The court concluded that this is all that the Convention requires, especially given the "strong federal policy in favor of arbitration," which "'applies with special force in the field of international commerce.'"  Id. (citing Mitsubishi Motors Corp., 473 U.S. at 63).

Similarly, in Filanto, supra, the plaintiff, an Italian footwear manufacturer, sued the defendant, a New York export-import firm, alleging breach of contract.  Filanto, 789

F. Supp. at 1230.  The defendant then moved to stay the action pending arbitration in Russia pursuant to the Convention.  Id.  Although both parties had signed a memorandum agreement that incorporated a Russian sales contract (which included an arbitration agreement), the plaintiff argued that it had specifically not agreed to participate in any arbitration, and, in fact, had objected to several other terms in the Russian sales contract by way of the cover letter that it sent to the plaintiff when it returned the memorandum agreement.  Id. at 1232.  Applying the federal common law of contract, the court examined a series of documents between the parties, including a document that post-dated the filing of the complaint, to find that an agreement in writing to arbitrate, for purposes of the Convention, was present.  Id. at 1240.  See also Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987) (arbitration clause valid under Convention because it was contained in an exchange of telexes, some of which were signed, to which the parties did not object); Chloe Z. Fishing Co. v. Odyssey Re (London) Ltd., 109 F. Supp. 2d 1236, 1247-48 (S.D. Cal. 2000) (holding that the conduct of the parties in negotiating insurance policies "affirmatively manifest[ed] their consent to arbitral clauses within the meaning of the 'exchange of letters or telegrams' requirement under the Convention").

  Applying these authorities here, it is plain that a series of documents--the original Moscow Dynamo and the Avangard Contract (both on the Standard Player's Contract form), Moscow Dynamo's qualifying offer and matching offer, the terms of the Standard Player's Contract, and the binding PHL regulations incorporated in the PHL Standard Player's Contract--created an agreement between Moscow Dynamo and Ovechkin.  And that agreement not only obligated Ovechkin to play for Moscow Dynamo under the terms

of the Avangard Contract, but it also mandates that any disputes related to the agreement be resolved by mandatory arbitration. Because an agreement to arbitrate that satisfies Article II of the Convention exists, this Court has subject matter jurisdiction and the motion to dismiss should be denied.

## II.    CERTIFICATIONS

The motion to dismiss also argues that the petition is procedurally defective because it does not attach authenticated copies of either the arbitration award or of the agreement to arbitrate. Non-authenticated copies of those documents are in the record as attachments to the petition (and their authenticity has not been contested), and are the source of the exhibits attached to this response. Nonetheless, petitioner's counsel is in the process of obtaining affidavits certifying the authenticity of the documents from Russia, and having them translated. They will be filed separately, as a supplement to the petition. Respondent has acknowledged that, if authenticated copies are submitted, then his procedural point will be satisfied. Ovechkin Mem. at 3 n.2.

## CONCLUSION

For the above reasons, the motion to dismiss should be denied and the Award should be enforced immediately.

　　　　　　　　　　　　　　　　　　　　/s/  William C. Sammons
　　　　　　　　　　　　　　　　　　　　William C. Sammons (admitted *Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　William S. Heyman, Bar No. 473451
　　　　　　　　　　　　　　　　　　　　Toyja E. Kelley, Bar No. 482977
　　　　　　　　　　　　　　　　　　　　Tydings & Rosenberg LLP
　　　　　　　　　　　　　　　　　　　　　100 East Pratt Street, 26th Floor
　　　　　　　　　　　　　　　　　　　　　Baltimore, Maryland  21202
　　　　　　　　　　　　　　　　　　　　　(410) 752-9700

　　　　　　　　　　　　　　　　　　　　Attorneys for Petitioner