**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
MOSCOW DYNAMO,                   )
                                )
              Petitioner         )
                                )
                                )    Civ. No. 05-2245 (EGS)
                                )
         v.                      )
                                )
                                )
ALEXANDER M. OVECHKIN,           )
                                )
              Respondent         )
_____ )


**AMENDED MEMORANDUM OPINION**

      Petitioner, Moscow Dynamo ("Dynamo"), a Russian sports club,

filed a petition pursuant to the Convention on the Recognition

and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21

U.S.T. 2517, 330 U.N.T.S. 38, reprinted in 9 U.S.C. § 201 (the

"Convention"), seeking confirmation of an award against

respondent, Alexander M. Ovechkin, who is currently playing

professional ice hockey for the Washington Capitals (the

"Capitals").  Dynamo claims that Ovechkin is contractually

obligated to play for Dynamo during the 2005-2006 hockey season,

and it seeks enforcement of a Russian arbitration award finding

Ovechkin in breach of that contract and banning him from playing

the 2005-2006 season for any club other than Dynamo.  Pending

before the Court is Ovechkin's Motion to Dismiss for Lack of

Subject Matter Jurisdiction.  A hearing on the motion was held on

December 21, 2005.  Upon careful consideration of Ovechkin's
motion, the response and reply thereto, oral arguments, the
governing statutory and case law, and the entire record, the
Court concludes that it does not have subject matter
jurisdiction.  Accordingly, petitioner's claim is DISMISSED WITH
PREJUDICE.

## I.   Background

Respondent, Alexander Ovechkin, is a professional ice hockey
player.  He played hockey in Russia as a teenager with the Moscow
Dynamo organization and Russian national teams.  Pet. at ¶ 10.
The Capitals selected him as their first overall pick in the 2004
National Hockey League ("NHL") draft on June 26, 2004, but the
2004-2005 NHL season was cancelled due to collective bargaining
disputes between the league and the players' union.  Pursuant to
a contract dated July 1, 2004, Ovechkin played hockey for Moscow
Dynamo, a member of Russia's Professional Hockey League ("PHL").
This contract was a  Standard Player's Contract, and it required
that all disputes arising out of the contract be arbitrated by
the Arbitration Committee.  The contract expired on April 30,
2005.  On April 26, 2005, Dynamo sent a letter to Ovechkin, which
offered him a new contract for the 2005-2006 season with a 30%
pay raise.  Pet.'s Opp. at Ex. C.  Ovechkin neither responded nor
acknowledged receipt of this letter.

On June 20, 2005, the NHL dispute had still not been

resolved, and Ovechkin signed a one-year PHL contract with a second Russian hockey club, the Avangard Omsk ("Avangard"), for the 2005-2006 season.  Pet. at ¶ 12.  Like the 2004-2005 contract Ovechkin signed with Dynamo, this contract was a Standard Player's Contract and included an arbitration clause.  On that day, Ovechkin agreed to a "Confidential Addendum to the Avangard Contract," which contained a compensation provision and a null and void clause.  According to that addendum, the Avangard contract would become effective on July 21, 2005, "only in the case the player does not sign the agreement with the NHL Club Washington Capitals."  Pet. Opp. at Ex. G.  The Avangard Contract would be automatically void if Ovechkin signed a contract offered by an NHL team prior to midnight on July 20, 2005.

Dynamo contends that its April 26, 2005 letter to Ovechkin constituted a "qualifying offer" under PHL regulations.  Pet. at ¶ 11.  Under PHL regulations, a team that extends a valid qualifying offer retains "matching rights" to a player if the player signs a contract with another team.  If a former team matches the financial aspects of the second contract, then the former team and the player automatically become parties to a binding contract, and the player must play for the former team. Award, Pet. at Ex. A at 5.  To be enforceable, a matching offer is required to match only the term and the financial aspects of the player's new contract.  Other, non-financial terms need not

be matched.  *Id*. at 4.  Dynamo sent a letter to Avangard on July 1, 2005 which claimed to exercise its matching rights with respect to Ovechkin.  Pet.'s Opp. at Ex. H.

On July 14, 2005, it was widely reported that the NHL and the Players Association had reached a deal on a new collective bargaining agreement.  Although the parties disagree as to precisely when the Avangard contract was voided, it is undisputed that the Capitals announced on August 5, 2005 that Ovechkin had agreed to terms.  Pet. Ex. C, doc. 2.  After the announcement, Dynamo advised the Capitals that it had exclusive rights to Ovechkin's services for the 2005-2006 season and commenced arbitration on October 6, 2005.  Dynamo sought an order enjoining Ovechkin from working for the Capitals or any other team until his contract with Dynamo expires on April 30, 2006.

The Arbitration Committee of the Russian Ice Hockey Federation (the "Arbitration Committee") held a hearing on October 20, 2005.  Ovechkin did not attend the hearing in person or through counsel, although the Arbitration Committee found he was properly served with the date and location of the hearing and a copy of the claim.  An agent for Ovechkin did attend the hearing as an observer only and not as a representative of Ovechkin.

The next day, on October 21, 2005, the Arbitration Committee entered an award in favor of Dynamo.  Award, Pet. Ex. A.

4

Although Ovechkin had not signed a 2005-2006 contract with
Dynamo, the Arbitration Committee nevertheless found a valid
contract between Dynamo and Ovechkin for the 2005-2006 season
based on a combination of: 1) the 2004-2005 contract Ovechkin
signed with Dynamo; 2) the April 26, 2005 letter, which it
construed as a proper exercise of Dynamo's matching rights; and
3) the Avangard contract.  Award, Pet. Ex. A at 5.  The
Arbitration Committee held:

> Dynamo has offered to Ovechkin in a timely manner a new
> contract with a 30% increase of the total amount of
> compensation, thus reserving the matching rights with
> respect to signing the contract with Ovechkin; and
> Dynamo in a timely manner has agreed to match the
> financial conditions of the preliminary contract
> between Avangard and Ovechkin.  Thereby, the contract
> between Dynamo and Ovechkin has come into full force
> and effect as of July 1, 2005 . . . ."

Award, Pet. Ex. A at 4.  As part of the award, the Arbitration
Committee enjoined Ovechkin from working for any professional
hockey club other than Dynamo until April 30, 2006.  *Id.*
Ovechkin, his agents, the Capitals, and the NHL all received
notice of the Award.

## II.  Standard of Review

Ovechkin moves to dismiss this action pursuant to Fed. R.
Civ. P. 12 (b)(1), alleging that this Court lacks subject matter
jurisdiction over Dynamo's claims.  A complaint may be dismissed
for lack of subject matter jurisdiction only if "it appears
beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief. In our review, this court assumes the truth of the allegations made and construes them favorably to the pleader." *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (D.C. Cir. 2003).  In the Rule 12(b)(1) context, the petitioner bears the burden of establishing jurisdiction. *Tripp v. Executive Office of the President,* 200 F.R.D. 140, 142 (D.D.C.2001); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C.1999)*.*

## III. Discussion

Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") provides that:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, *reprinted in* 9 U.S.C. § 201.  Article II further states: "The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." *Id.*  Without an agreement in writing that satisfies this provision, there is no subject matter jurisdiction. *Czarina, LLC v. W.F. Poe*

6

*Syndicate*, 358 F.3d 1286, 1291 (11th Cir. 2004).

Ovechkin moves to dismiss on the grounds that this Court has no subject matter jurisdiction over Dynamo's petition because there is no signed agreement in writing to arbitrate this dispute.  Ovechkin argues, and Dynamo concedes, that Ovechkin never signed a 2005-2006 standard PHL contract with Dynamo, which would have included an arbitration clause.  Dynamo responds that the "written agreement" requirement is satisfied by three documents that constitute an "exchange of letters" contemplated by Article II: 1) the 2004-2005 contract Ovechkin signed with Dynamo; 2) the April 26, 2005 letter, which it construed as a proper exercise of Dynamo's matching rights; and 3) the Avangard contract.  In other words, Dynamo argues that the same documents upon which the Arbitration Committee found its jurisdiction over this matter should also satisfy the "written agreement" jurisdictional requirement of Article II.[1]

"To determine whether an award falls under the Convention, and thus, whether the district court has jurisdiction over the action to compel arbitration or to confirm an award, courts look

---

[1]In its response to Ovechkin's motions, Dynamo suggested that the issue of whether Moscow Dynamo properly exercised its matching rights, and therefore bound Ovechkin to play for it during the 2005-2006 season, has already been decided by the Arbitration Committee.  Pet.'s Opp. at 6.  At the hearing, however, Dynamo conceded this Court has to make an independent determination of whether there was an agreement to arbitrate in order to determine the issue of this Court's jurisdiction.

to the language of the Convention." *Czarina,* 358 F.3d at 1291
(*citing Sphere Drake Ins. PLC v. Marine Towing, Inc.*, 16 F.3d
666, 669 (5th Cir. 1994); *Kahn Lucas Lancaster, Inc. v. Lark
Int'l Ltd.*, 186 F.3d 210, 215 (2d Cir. 1999)).  Because Ovechkin
never exchanged a written document of any kind with Dynamo after
the expiration of his 2004-2005 contract, the Court must decide
whether the 2004-2005 contract Ovechkin signed with Dynamo, the
April 26, 2005 letter from Dynamo to Ovechkin, and the Avangard
contract constitute an "exchange of letters" that contain an
agreement to arbitrate.

1. *Dynamo's Argument that Ovechkin Agreed, in Writing, to
   Arbitrate this Dispute*

Dynamo is correct that when contract law principles
demonstrate the existence of an arbitration agreement between the
parties, courts will find that Article II is satisfied and that
subject matter jurisdiction is proper.  *See Standard Bent Glass
Corp. v. Glassrobots Oy*, 333 F.3d 440 (3d Cir. 2003) (affirming
the district court's holding that the parties were required to
arbitrate their dispute even though they had not signed an
arbitration agreement because an agreement to arbitrate was
incorporated by reference from a previous document exchanged by
the parties).  Conversely, the Court cannot impose arbitration on
parties if they have not contractually agreed to it.  "Th[e]
principle of arbitration exists because arbitration is a creature
of contract, and thus the powers of an arbitrator extend only as

8

far as the parties have agreed they will extend." *Czarina,*358
F.3d at 1293.   In this case, Dynamo has presented no evidence
that Ovechkin expressed his affirmative acceptance of an
agreement to arbitrate.

Dynamo mistakenly analogizes the "exchange" in this case to
the exchange by the parties in *Standard Bent Glass*.  In *Standard
Bent Glass*, the plaintiff, a Pennsylvania corporation, brought an
action against a manufacturer in Finland, alleging defects in a
glass fabricating system.  Negotiations had begun in March of
1998, and they reached a critical juncture on February 1, 1999,
when plaintiff faxed an offer to purchase the system from
defendant.  On February 2, 1999, Glassrobots responded with a
cover letter, invoice, and a standard sales agreement that
included an arbitration clause.  Later that day, plaintiff faxed
a return letter that requested five specific changes to
Glassrobots' sales agreement.  The letter concluded, "Please call
me if the above is not agreeable.  If it is we will start the
wire today."  *Id.* at 442.  The parties continued to modify the
agreement by faxing changes to one another until August 5, 1999,
when the parties signed the Acceptance Test Protocol, which
stated: "We undersigners hereby certify the performance and
acceptance test according to the Sales Agreement TSF II 200/320
between Standard Bent Glass Corp., USA and Glassrobots Oy has
been carried out."

9

The court held that Glassrobots' February 2, 1999 sales agreement was an offer that plaintiff accepted when it proposed five specific modifications.  It held plaintiff's conduct on February 2 "constituted a definite and seasonable expression of acceptance that evinced the formation of a contract rather than a counteroffer or a rejection." *Id.* at 446.  After finding a valid contract based on the terms of the February 2, 1999 sales agreement, the court then concluded the arbitration clause of that sales agreement was incorporated in the exchange of faxes culminating in the August 5, 1999 Acceptance Test Protocol. *Id.* at 449-50.

The unilateral conduct of Dynamo pales in comparison with the factual exchange of correspondence between the parties in *Standard Bent Glass*.  In *Standard Bent Glass*, the parties had engaged in written negotiations with one another via facsimile for over a year.  The Third Circuit found actual conduct by the plaintiff on February 2, 1999 and August 5, 1999 that constituted an expression of acceptance and which kept the arbitration clause of the February 2, 1999 agreement in play.

In the present case, however, no such written exchange of correspondence exists.  Ovechkin never responded, expressly or impliedly, to Dynamo's "matching letter" of April 26, 2005.  Communications with Dynamo came to a screeching halt when Ovechkin's contract expired on April 30, 2005.  Unlike the

plaintiff in *Standard Bent Glass*, Ovechkin made no modifications of a previous contract.  Rather, Dynamo asks the Court to infer Ovechkin's agreement to arbitrate based on nothing more than an expired agreement to do so, a unilateral matching offer from Dynamo, and Ovechkin's agreement to play for Avangard for the 2005-2006 season, which was subject to a null and void clause. The Avangard contract is not a letter from Ovechkin to Moscow Dynamo, let alone an agreement to arbitrate with Moscow Dynamo. The Court cannot find any evidence of an exchange of documents between the parties at all, let alone "a definite and seasonable expression of acceptance" by Ovechkin to a 2005-2006 contract with Dynamo.  *See Standard Bent Glass Corp.*, 333 F.3d at 446.

Dynamo's other cited cases are distinguishable on the same grounds.  In each of those cases, the party opposing arbitration had affirmatively demonstrated its acceptance of an agreement to arbitrate.  *See Genesco*, *Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987) (finding an agreement to arbitrate because the parties had transacted business in a series of exchanges of purchase orders and confirmation notes, when the confirmation notes included an arbitration clause); *Chloe Z Fishing Co., Inc. et al. v. Odyssey Re (London) Ltd.,* 109 F. Supp. 2d 1236, 1247-51 (S.D. Cal. 2000) (holding that defendant agreed to arbitrate because plaintiff's insurance broker submitted "slips" to the defendant requesting insurance pursuant to the terms of the

standard insurance policies, which contained arbitral clauses, and the defendant affixed its stamp on the slips and issued certificates of insurance to plaintiffs' broker which referred to the standard insurance policies); *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F. Supp. 1229, 1240 (S.D.N.Y. 1992) (finding plaintiff had agreed to arbitrate because defendant had signed and sent to plaintiff a Memorandum Agreement requiring arbitration in Russia and, although plaintiff initially rejected the arbitration provision, it subsequently sent a letter affirmatively purporting to rely on various provisions of the contract it had rejected).

In sum, Dynamo has pointed to no factual predicate or legal authority to support its argument that a written agreement to arbitrate can be found absent a written exchange demonstrating both parties' agreement to arbitrate with one another. The Court is not persuaded to imply Ovechkin's written consent to arbitrate when he never communicated with Dynamo, let alone negotiated an arbitration clause with a third party, subsequent to the expiration of his 2004-2005 contract. The Court is aware of no alchemical formula that can transform an expired contract, Dynamo's unilateral matching offer, and Ovechkin's signed contract with a third party into a "definite and seasonable expression of acceptance" by Ovechkin of Dynamo's offer to play for that team for the 2005-2006 season. To the contrary,

Dynamo's patchwork of documents, without more, persuasively supports the argument that Ovechkin wished to end his relationship with Dynamo once and for all.

This Court does not reach the issue of whether, under Russian contract law, the parties agreed to a 2005-2006 contract and, in doing so, to arbitration.  Rather, the Court makes the narrow determination that the documents identified by Dynamo and the Arbitration Committee do not satisfy Article II's requirement that there be an "agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship . . . ." Convention, 21 U.S.T. 2517, 330 U.N.T.S. 38, *reprinted in* 9 U.S.C. § 201.

**IV.  Conclusion**

For the reasons stated herein, it is by the Court hereby ORDERED that Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction is GRANTED and this case is DISMISSED WITH PREJUDICE.  An appropriate Order accompanies this Memorandum Opinion.


**Signed:   Emmet G. Sullivan**
           **United States District Judge**
           **January 18, 2006**

13